[No. H024504. Sixth Dist. Jan. 27, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ADAMS, Defendant and Appellant.

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share, Amy Haddix and Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, J.**—Defendant Michael Adams was convicted at a 2001 jury trial of 20-year-old charges of first degree murder with rape and sodomy special circumstances. On appeal, he contends his constitutional rights were violated on a number of grounds including exclusion of third party culpability evidence.

## FACTS

Around 10:30 a.m. on Wednesday, June 17, 1981, Sylvia Edgren was found dead in her yellow Pinto on Casanova Avenue in Monterey. The body was kneeling, barefoot, and facedown on the front seat. It was nude from the waist down, and there was dried fluid on the inner thighs. Blood was concentrated around the head and shoulders and was also found on the right rear side and back windows. A blouse, shorts, and underpants were crumpled up in the backseat of the car.

Identification found in the Pinto gave Edgren's name and address. At her apartment complex, a pool of still-wet blood was on the floor of her empty parking stall. There was a tire track through the blood and two or three footprints. The lightbulbs in the carport had been shattered and a floodlight outside the carport had been unscrewed. One neighbor reported hearing a woman scream either late at night or early in the morning and, when the neighbor left for work before 6:00 a.m., he saw wet blood in the carport but no tire tracks or footprints. Another neighbor reported seeing a young White man unscrewing the carport light bulbs at 10:00 or 10:30 p.m. the night before. There was a dusty Ford Mustang to the far right of Edgren's parking stall from which a palm print was recovered. A total of 45 latent prints were recovered from the carport and the Pinto. Of these, the print on the unscrewed floodlight was a building maintenance worker's. Twenty-two were Edgren's. All remaining prints were unidentified.

An autopsy revealed that Edgren had been struck two to five times on the back and top of the head with a hard, elongated blunt object causing loss of consciousness within seconds and death within minutes. The fluid on her legs was dried semen, and a post mortem rape kit and swabs were taken. Semen was present on the vaginal and rectal swabs.

Edgren's apartment was undisturbed and there were no signs of a struggle. There was an advertisement for a male roommate and numerous men's names and telephone numbers were found in a desk calendar for May and June. Defendant's name and telephone number were entered on six days. There was a notation next to defendant's name on the June 8 entry that said "TUES 10:00." On Tuesday, June 16, the night of the murder, Edgren left her ex-husband's home after 10:00 p.m., stating that she was going to meet a prospective tenant.

Police assembled a list of 11 possible suspects and eight possible motives. Defendant was not on the list. The number one suspect was Edgren's "off and on" boyfriend with mental problems, Frederick Kallerup. Edgren's ex-husband was third on the list because he and Edgren had arguments and fights on a regular basis and he might have owed her money at the time of the killing.

Police interviewed defendant on June 26, 1981. He stated he had talked to Edgren by phone several times in early May about her ad for a roommate, but it was not until the end of May that she called to say the room was available. Defendant told her he had found another place. He denied that he had ever seen Edgren in person.

In 1999, DNA-typing was done on the swabs. Kallerup was eliminated as the donor. On January 11, 2001, a criminalist ran the DNA profile taken from

the vaginal swab against the criminal justice DNA database, and made a "cold hit" to defendant's DNA profile. Further tests of a blood sample taken from defendant confirmed the match. Based on the race of the donor, the estimates of the probability of a random match ranged from one in 320 billion to one in 5.5 trillion. Defendant's finger and palm prints were then compared to latents recovered from the crime scene. Defendant's palm print matched the print on the Mustang.

Defendant was re-interviewed on January 19, 2001. Defendant stated he had been staying with a girlfriend but was looking for an apartment. He saw Edgren's advertisement and went to her apartment and met her for two hours. She later called him at his workplace and said she had found someone to whom to rent the room. Defendant said that was fine with him because he could not afford what she had been asking.

Defendant stated he had been in Sacramento attending his girlfriend's mother's funeral on the weekend that Edgren had been killed. He read about the murder in the newspaper. Defendant denied having physical or sexual contact with Edgren. He recalled having his blood drawn but did not see any reason that his DNA could have been found on her body.

Detective Sonne testified that defendant had initially been open and friendly, but when DNA was mentioned, he started to tremble, his lips became dry, and his voice became louder and more highly pitched. He would make exaggerated gulps and swallow while speaking. Defendant had not attempted to elude or escape the officers.

Defendant testified at his trial. He had lived with "Lucky" McDonald, a woman nearly 40 years his senior, "off and on" from the late 1970's to the mid 90's, during which time they were dating. However, the relationship had become "unbearable," and defendant decided to move out. He responded to Edgren's newspaper ad for a room during the first week of May 1981. He spoke to her by phone and then went to meet her and see the room. Edgren told him that her renter was moving out on June 1. During the initial interview, she confided in him about problems she had with her family and ex-husband.

Around Sunday, May 20, Edgren called him and they met after work that evening. She was depressed and needed company. Defendant cooked a meal and stayed about four hours. Edgren talked to him about arguing with her ex-husband. When he left, she hugged him and "almost guaranteed" he could rent the room.

Two days later, defendant visited her again. She was depressed and they held each other and cried. She said her ex-husband owed her money.

Defendant stayed about six hours. Although he was 24 and she was 45, they seemed to be becoming "a little bit more" than friends.

Around the first week in June when Edgren's current roommate had moved out, defendant and Edgren had sexual intercourse. Edgren was upset because the roommate had left her "in dire straights [*sic*] just like everybody" and her boyfriend Kallerup also owed her money.

Defendant and Edgren saw each other frequently after that. She called him approximately five times a day at work, upsetting his employer. He and Edgren spent another day together in Santa Cruz. They made love on the beach and again at Edgren's apartment.

Defendant described Edgren as a "recluse" who kept to herself and rarely went out. However, when she did, she was paranoid that someone was following her. She felt she had been "under someone's foot" for 20 years.

Defendant decided to reconcile with McDonald. When he told Edgren he had decided not to move into her apartment, she became "needy" and called him often at his workplace. Defendant continued to see her, but tried his best to "wean her off me."

The night of the murder, Edgren called defendant at work and asked him to come to her apartment. He went there at 10:00 p.m. after he got off work. Edgren was "real tense" and reported that she had had a "falling out" with her ex-husband and needed money and that Kallerup wanted to get back in her life and had been following her. Defendant stayed until 2:00 a.m. and had sex with her. She walked him to the door and that was the last time he saw her.

Defendant stated the Mustang had always been in the carport. He denied touching it. He had parked in the carport on several occasions, but not next to the Mustang. Defendant could not explain why his name did not appear in Edgren's calendar until May 21 if he contacted her in the first week of May. There was no evidence, other than defendant's testimony, of his intimate relationship with her. Defendant could not explain why Edgren referred to him in her calendar by his first and last name despite his claim of an intimate relationship.

Defendant admitted that his regular night off at work was Tuesday, however, he insisted that on the night of the murder, a Tuesday, he went to Edgren's apartment straight from work. He also admitted that he parked his car blocks away in a Safeway parking lot rather than in front of Edgren's residence.

Defendant explained that when he spoke to a detective in 1981, he had been frightened. He denied a sexual relationship with Edgren because Monterey County was "kind of small thinking" at the time and unprepared for an interracial relationship. In addition, he had legal problems on the east coast that he did not want surfacing, so he told the detective he had never seen Edgren in person.

When Detectives Sonne and Clark appeared in 2001, defendant did not admit he had sex with Edgren because he had not said anything about sex in 1981. During the 2001 interview, he became very nervous because one detective had a hand on his revolver. As an insulin-dependent diabetic, defendant normally experienced dehydration, which causes excessive gulping.

The jury convicted defendant of the charges and the trial court sentenced defendant to life without the possibility of parole. This appeal ensued.

## ISSUES ON APPEAL

Defendant asserts his federal constitutional rights were violated when (1) the court excluded third party culpability evidence, (2) blood samples were seized under Penal Code section 295 et seq.[1] without probable cause nor individualized suspicion, and (3) the trial court failed to instruct that a felony-murder special circumstance requires a finding of specific intent to kill. Defendant also argues that the trial court erred in failing to award any local credits beyond actual custody credits.

## THIRD PARTY CULPABILITY EVIDENCE

Defendant claims the court erred under California law and violated his right to due process by refusing to allow defendant to produce evidence suggesting that Kallerup killed Edgren. In addition to showing that Edgren and Kallerup had a stormy and violent history; defendant proposed to call Nancy Wilson to testify she talked with Kallerup four to five months before the killing when he told her " 'that he was very angry and frustrated' " with the victim and " 'that there had been a physical battle between the two of them.' " Maureen Doyen, a missing witness, would have testified that Edgren told her that " 'Rick Kallerup tried to kill her by choking her around the neck.' "

According to defendant, "[t]he admissibility of third party culpability evidence was debated early and often." The issue was brought to a head by the prosecution's motion to preclude the defense attorney "from asking any

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

questions about Frederick Kallerup, including questions to police about why he was first considered a suspect, questions to other witnesses about his mental condition, questions about any alleged prior acts of violence, questions about his sexual relationship with the victim, and questions about his whereabouts on the night of the murder, if those questions are being asked to try to establish third party culpability."

Defendant responded that Kallerup had originally been the "prime suspect." The police had deemed it "possible" that Kallerup could have been responsible notwithstanding his alibi. Moreover, the alibi should not be accepted uncritically. In addition, the autopsy pathologist could not say whether there had been consensual or nonconsensual sex. Furthermore, "[a]ccording to former Monterey detective Wustrack's June 22, 2001, preliminary hearing testimony, he found Camel cigarette butts smoked way down to the end as if it might burn the smoker, both in Ms. Edgren's apartment, and in the Townhouse Motel where Mr. Kallerup was located the day after the killing. . . . Additionally, Monterey investigators found two (2) crushed Budweiser beer cans a couple of days after the killing in decedent's carport, looking exactly like those located in Mr. Kallerup's motel just after the incident. [¶] . . . [¶] The many artifacts in Ms. Edgren's apartment establishing Mr. Kallerup's close ties to decedent should also be admitted to corroborate recent contacts between the two. The nude and erect photo of Kallerup[2] would show some type of recent and/or continuing relationship between the two, regardless of when it was taken. Why would Ms. Edgren still have it, if the relationship was totally severed? Many of his drawings were found in her room by the police. They would establish a continuing, though volatile[,] relationship between them."

The prosecution countered that Edgren was a "pack rat" who "kept every letter ever written to her," and that the artifacts were not evidence of recent contacts between Kallerup and Edgren. The sketches found in the apartment bearing Kallerup's name were either undated or dated "1980." Edgren admitted a lot of men that she was interviewing to be a roommate into the apartment, and she was a smoker. The defense had failed to seek DNA testing of the cigarette butts found in her apartment.

The crushed beer cans were found near the murder scene three days after the homicide. The beer cans found in Kallerup's motel room were not identically crushed. The beer cans outside the carport were Budweiser's and those in Kallerup's motel room were Coors. A fingerprint had been recovered from a crushed Coors can but none had been found on the cans near the carport. The print on the Coors can did not match any of the latent prints

---

[2] The "photograph" was actually a drawing with an erect penis dated May 1980 with the name Rick Kallerup on it.

recovered by police. Kallerup's fingerprints were not among the usable latents found in the apartment, car, or carport. Finally, Kallerup had been "dead for a number of years."

The prosecutor had interviewed Steven Syrja, Edgren's January-to-June 1981 roommate on March 4 and 5, 2002. Syrja recalled Kallerup's visiting and staying at the apartment no later than April. Syrja believed Kallerup was Edgren's boyfriend but could not confirm it and he thought Kallerup was quirky but harmless. He did not fear Kallerup even though Kallerup was schizophrenic. He recalled Kallerup drinking but did not remember if he smoked; and Syrja spent eight hours in a car with Maureen Doyen, his former girlfriend, who had a "flair for the dramatic" but who never mentioned an attempt by Kallerup to kill Edgren.

The trial court examined the evidence proffered by the defense and concluded "the evidence . . . is not sufficient to qualify under the California standard for third-party culpability evidence; therefore, it is deemed inadmissible at trial and the Court does grant the motion to exclude such evidence."

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in *Mendez*, evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*); *People v. Mendez* (1924) 193 Cal. 39 [223 P. 65]; also see *People v. Arline* (1970) 13 Cal.App.3d 200 [91 Cal.Rptr. 520].)

■ In assessing the admissibility of third party culpability evidence, the trial court must consider whether the evidence could raise a reasonable doubt as to the defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [65 Cal.Rptr.2d 145, 939 P.2d 259].) The trial court's determination of this issue is reviewed for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372 [110 Cal.Rptr.2d 272, 28 P.3d 34].) "[J]udicial discretion is . . . . 'the sound judgment of the court, to be exercised according to the rules of law.' [Citation.] . . . [T]he term judicial discretion 'implies absence of arbitrary determination, capricious disposition or whimsical thinking.' [Citation.] Moreover, discretion is abused whenever the court

exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].)

In the instant case, the trial court correctly concluded that the evidence proffered by the defense was "lacking sufficient direct or circumstantial evidentiary value or connection to link Mr. Kallerup to the actual perpetration of the crime or crimes." The crushed beer cans found outside the carport were a different brand from the cans in Kallerup's motel room. The cigarette butts were found in the apartment, not at the crime scene which was in the carport. Furthermore, in the absence of fingerprint or DNA evidence linking the cigarette butts to an individual, they could have been left by any of the many individuals who had come to Edgren's apartment. "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684, 681–682 [248 Cal.Rptr. 69, 755 P.2d 253].)

In addition, Kallerup's history of violence toward Edgren, without direct or circumstantial evidence linking Kallerup to the actual perpetration of the crime, was inadmissible under Evidence Code section 1101. (*People v. Davis* (1995) 10 Cal.4th 463, 500–501 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Wilson's proposed testimony that Kallerup told her he was angry and frustrated with Edgren and that the two had had a "physical battle" and Doyle's that Edgren told her that Kallerup once choked her were insufficient to link Kallerup to the actual perpetration of the crime. (*People v. Alcala* (1992) 4 Cal.4th 742, 792 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Moreover, neither of the two witnesses had personal knowledge that Kallerup had assaulted Edgren. Consequently, their statements were inadmissible hearsay which cannot form a basis for third party culpability. (*People v. Bradford, supra,* 15 Cal.4th at pp. 1324–1325.) They also do not establish Kallerup's presence at the scene of the murder. "[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt . . . ." (*Hall, supra,* 41 Cal.3d at p. 833.)

Finally, Kallerup's drawings, undated except for two dated March 1981 and May 1980, could not link Kallerup to Edgren "in the hours before her death, or indeed on the date of her death." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136 [124 Cal.Rptr.2d 373, 52 P.3d 572].) The trial court did not abuse its discretion in excluding the evidence.

Nevertheless, defendant declares his Fifth and Fourteenth Amendment due process rights and his Sixth Amendment right to present a defense were violated by the exclusion of the evidence because he had "an unquestionable

right to present relevant exculpatory evidence to the jury." Defendant cites numerous United States Supreme Court cases that "repeatedly indicated that a State may not use its general rules of evidence or procedure to bar material testimony which is crucial to a criminal defendant's defense."[3] For example, in *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 93 S.Ct. 1038], the exclusion of defendant's proffered testimony of three witnesses that a third party had confessed to them that he committed the crime of which the defendant stood accused violated the defendant's Fourteenth Amendment due process rights. Similarly, in *Green v. Georgia* (1979) 442 U.S. 95, 96–97 [60 L.Ed.2d 738, 99 S.Ct. 2150], exclusion of defense hearsay that a person convicted and sentenced to death for the same murder stated that he had killed the victim alone after sending the defendant on an errand deprived the defendant of a fair trial. Defendant concludes "the state rules [of evidence] must bow to a constitutional mandate."

Defendant also complains that "there is an 'imbalance' in the way in which California trial courts apply [Evidence Code] section 352 when evidence is offered by the prosecution and defense, respectively, and an apparent imbalance in the manner in which the 'abuse of discretion' standard is applied on appeal when the appeal is by the prosecutor and defendant, respectively. [¶] As for the trial courts, evidence of the type at issue here is uniformly admitted when offered against a defendant and uniformly rejected when offered by a defendant. In the appellate arena, a steady stream of published opinions reject defense claims of 'abuse of discretion,' yet abuse of discretion is regularly found when the State objects to the rare election by a trial court to dismiss a strike in the 'three strikes' context."

As we stated above, the trial court did not abuse its discretion. Under Evidence Code section 352, the trial court had the duty to determine whether the evidence could raise a reasonable doubt as to the defendant's guilt and whether it was substantially more prejudicial than probative. (*People v. Bradford, supra,* 15 Cal.4th at p. 1325.) The hearsay statements, drawings, beer can and cigarette evidence was totally irrelevant. Kallerup's statement that he was angry and frustrated with Edgren, made four or five months before the killing, was not a confession to Edgren's murder as in *Chambers v. Mississippi, supra,* 410 U.S. at page 302, and *Green v. Georgia, supra,* 442 U.S. at pages 96–97, nor was it a statement of intent to murder. Edgren's statement at an unknown time that Kallerup had choked her some time previously was not shown by other evidence to be connected to her murder.

---

[3] Three of the cited cases are *Michigan v. Lucas* (1991) 500 U.S. 145 [114 L.Ed.2d 205, 111 S.Ct. 1743] [preclusive effect of statutory "notice of evidence" requirement in a rape case]; *Taylor v. Illinois* (1988) 484 U.S. 400 [98 L.Ed.2d 798, 108 S.Ct. 646] [sanction of preclusion for defense violation of discovery rules]; and *Rock v. Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704] [exclusion of defendant's testimony under state rule disallowing all hypnotically refreshed evidence].

The drawings made in May 1980 and March 1981 also had no temporal connection to the June 17, 1981, murder. The beer cans and cigarette butts had no connection to Kallerup. In short, none of the evidence had a tendency in reason and logic to prove or disprove any disputed fact that was of consequence to the determination of the action. (Evid. Code, § 210.)

The court's ruling did not deprive defendant of presenting some third party culpability evidence to the jury. There was testimony that the victim had an on-and-off and sometimes volatile relationship with Kallerup, who was reportedly mentally unstable and who was the prime suspect for years. Edgren told defendant shortly before her murder that she suspected Kallerup and his friends were following her. Edgren fought with her ex-husband on the night of the murder. He owed her money. He was suspect number three for years. In addition, in the month before her murder, Edgren had a falling out with Syrja over money. Finally, over 40 men had been to Edgren's apartment applying to rent a room.

██ Since the court did not exclude the only evidence that would potentially link a third party to commission of the crime, there was no prejudice. (*Hall*, *supra*, 41 Cal.3d at p. 835.) Furthermore, although defendant has accused the trial court of applying Evidence Code section 352 in an uneven manner, he has not demonstrated it. Therefore, he has failed to bear his burden of showing a constitutional violation as a demonstrable reality, not mere speculation. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1221 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) There was no abuse of discretion and no error.

## SEIZURE OF BLOOD

Next, defendant claims that collection of his blood when he was a state prisoner pursuant to section 295 for inclusion in the state's convicted offender DNA database violates the Fourth Amendment to the federal constitution. Defendant moved to suppress the DNA-typing evidence raising the issue that the forced extraction of blood violates a person's "most personal and deep-rooted expectations of privacy." (*Winston v. Lee* (1985) 470 U.S. 753, 760 [84 L.Ed.2d 662, 105 S.Ct. 1611].) Defendant now claims the trial court erred in denying his motion.

Defendant concedes that the California case *People v. King* (2000) 82 Cal.App.4th 1363, 1372 [99 Cal.Rptr.2d 220] (*King*), is against him. *King* articulates a balancing test, namely, that "[i]n limited circumstances, where the privacy interests implicated by a search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be

reasonable despite the absence of such suspicion. [Citations.]" (*Id.* at p. 1374.) The People cite us to the later decided *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492 [120 Cal.Rptr.2d 197] (*Alfaro*) which also held that collection of blood samples for California's Convicted Offender DNA Database and Data Bank Program do not violate the Fourth Amendment. However, defendant claims that the United States Supreme Court cases of *Ferguson v. Charleston* (2001) 532 U.S. 67 [149 L.Ed.2d 205, 121 S.Ct. 1281] (*Ferguson*) and *Indianapolis v. Edmond* (2000) 531 U.S. 32 [148 L.Ed.2d 333, 121 S.Ct. 447] (*Edmond*) make clear that the "special needs" doctrine, which he states *King* found was inapplicable, remains the controlling standard. In that doctrine, the court observed that individualized suspicion is normally required for a reasonable search and seizure. However, suspicionless searches may be upheld where conducted under a program designed to serve " 'special needs, beyond the normal need for law enforcement.' " (*Id.* at p. 37.) Searches for administrative purposes, and at border checkpoints, and license/registration checks serve such special needs. (*Id.* at pp. 37–38.)

In *Edmond,* defendant challenged a highway checkpoint, the primary purpose of which was to identify persons transporting drugs. Under the program, police would stop vehicles momentarily, ostensibly to ask the driver for license and registration. During the stop, a dog trained to locate drugs would check the car from the outside. (*Edmund, supra,* 531 U.S. at p. 35.) The court found a "difference in the Fourth Amendment significance of highway safety interests and the general interest in crime control." (*Id.* at p. 40.) The court stated the primary purpose of the Indianapolis checkpoint program was interdicting drugs, even though it also had the effect of reducing the number of unsafe drivers. (*Id.* at pp. 41–42.) Since the program's primary purpose was general crime control, individual suspicion was required, notwithstanding the secondary effect. (*Id.* at pp. 46–47.)

*Ferguson, supra,* 532 U.S. at pages 72–73, involved a challenge to a program which allowed hospitals to screen maternity patients' urine samples for drugs if the patient met criteria suggesting possible drug use. Where evidence of drugs was found, it was given to police if the patient refused drug treatment. The court found that the "central and indispensable feature of the policy" was the use of law enforcement to coerce treatment. (*Id.* at p. 80.) The court "carried out a 'close review' of the scheme" to determine the program's primary purpose. (*Id.* at p. 81.) Because the primary purpose was "to generate evidence *for law enforcement purposes,*" the "case simply does not fit within the closely guarded category of 'special needs.' " (*Id.* at pp. 83–84.)

The DNA and Forensic Identification Data Base and Data Bank Act of 1998 (Act) set out in section 295 et seq., states that any person who is

convicted of a specified crime must "provide two specimens of blood, a saliva sample, right thumbprints, and a full palm print impression of each hand for law enforcement identification analysis." (§ 296, subd. (a)(1).) The California Department of Justice shall serve as a repository for those items, perform a deoxyribonucleic acid (DNA) analysis and any other forensic identification of them, and "store, compile, correlate, compare, maintain, and use DNA and forensic identification profiles and records" (§ 295.1, subds. (a), (c)) for use as an "effective law enforcement tool" in the "expeditious detection and prosecution of individuals responsible for sex offenses and other violent crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children." (§ 295, subds. (b)(3), (c).)

Defendant complains that the extraction of a prisoner's blood is a search and seizure requiring reasonable suspicion or a warrant. He asserts that there is no "special need" for the program beyond general law enforcement purposes and " 'the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment.' (*Mincey v. Arizona* [(1978) 437 U.S. 385,] 393 [57 L.Ed.2d 290, 98 S.Ct. 2408].)"

"DNA data base and data bank acts have been enacted in all 50 states as well as by the federal government. [Citations.] Various constitutional challenges to these acts have been rejected consistently. [Citation.] A challenge to former section 290.2, the predecessor of the Act, was rejected in this state by *People v. King*[, *supra,*] 82 Cal.App.4th 1363 [99 Cal.Rptr.2d 220]. The various decisional authorities addressing and rejecting constitutional challenges to state DNA data base and data bank acts are collected in the Annotation, Validity, Construction, and Operation of State DNA Database Statutes [(2000)] 76 A.L.R. 5th 239.

"In view of the thoroughness with which constitutional challenges to DNA data base and data bank acts have been discussed, there is little we would venture to add. We agree with existing authorities that (1) nonconsensual extraction of biological samples for identification purposes does implicate constitutional interests; (2) those convicted of serious crimes have a diminished expectation of privacy [which specifically extends to the person's identity (*King, supra,* 82 Cal.App.4th at p. 1374)] and the intrusions authorized by the Act are minimal; and (3) the Act serves compelling governmental interests. Not the least of the governmental interests served by the Act is 'the overwhelming public interest in prosecuting crimes *accurately*.' [Citation.] A minimally intrusive methodology that can serve to avoid erroneous convictions and to bring to light and rectify erroneous convictions that have occurred manifestly serves a compelling public interest. We agree with the

decisional authorities that have gone before and conclude that the balance must be struck in favor of the validity of the Act." (*Alfaro, supra,* 98 Cal.App. 4th at pp. 505–506.)

Defendant's assertion that this court must identify a " 'special needs' beyond the normal need for law enforcement" before undertaking a balancing analysis overlooks the fact that the class of persons subject to the Act is convicted criminals, not the general population. As stated above, convicted criminals do not enjoy the same expectation of privacy that nonconvicts do. The cases on which defendant relies involved different populations of test subjects. *Edmond, supra,* 531 U.S. at page 41, involved motorists being stopped at drug interdiction checkpoints for the primary purpose of uncovering evidence of criminal wrongdoing. *Ferguson, supra,* 532 U.S. at pages 77–78, involved state hospital obstetrics patients who had an expectation of privacy in their medical records and who were subjected to an invasion of privacy which was "far more substantial" than in the cases of other drug test subjects, namely, railway employees involved in train accidents, government employees seeking promotion to certain sensitive positions, and high school students participating in interscholastic sports.

■ Deterrence and prevention of future criminality and accurate prosecution of past crimes are purposes served by DNA testing and courts have upheld DNA acts for the law enforcement purpose of solving crimes. (*Rise v. State of Oregon* (9th Cir. 1995) 59 F.3d 1556, 1561; *Jones v. Murray* (W.D.Va. 1991) 763 F.Supp. 842; *King, supra,* 82 Cal.App.4th at p. 1376; *Alfaro, supra,* 98 Cal.App.4th at p. 505.) In addition, the Act exempts all DNA and forensic identification profiles and other identification information from any law requiring disclosure of information to the public, and it makes the information confidential. (§ 299, subds. (a), (b).) The Department of Justice must comply with the provisions of the Information Practices Act of 1977 (Civ. Code, § 1798 et seq.) which "requires a public agency to limit the collection and retention of personal information to that necessary to accomplish the agency's specific purpose, and restricts disclosure of such information. (Civ. Code, §§ 1798.14, 1798.24; [citation].) These provisions are relevant in determining the extent of an intrusion upon privacy interests and in balancing the intrusion against the public interests to be served. [Citation.]" (*Alfaro, supra,* 98 Cal.App.4th at p. 508, fn. 6.)

At oral argument defendant raised the specter of the passage of future statutes requiring every arrestee to give a blood sample or allowing law enforcement to insert its investigatory tentacles into any database—two mentioned being the Red Cross database of blood donors and the FBI database currently used to support expert witness testimony at trials—for law enforcement purposes even though the purposes for which the blood was collected

were limited and the individuals retained privacy interests in their identities as was done and disapproved in *Edmond, supra,* 531 U.S. 32, and *Ferguson, supra,* 532 U.S. 67.

 Statutes attempting this may very well be in the future. We have no reason to discuss them absent their own particular circumstances and provisions. We are talking about a criminal justice database taken and maintained for criminal justice purposes. The individuals who are required to give samples have been found guilty beyond a reasonable doubt of serious crimes such as murder, manslaughter, sexual offenses, assaults, and kidnapping (§ 296, subd. (a)(1)), either by a trier of fact or by their own admission. One result of their crimes is that society has a vastly increased interest in their identities. "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' [Citation.]" (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 654 [132 L.Ed.2d 564, 115 S.Ct. 2386].) "By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identities. In short, any argument that Fourth Amendment privacy interests do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government." (*King, supra,* 82 Cal.App.4th at p. 1375, fn. omitted.) The trial court did not err in refusing to suppress the DNA profile evidence.

## FAILURE TO INSTRUCT ON SPECIFIC INTENT

Next, defendant complains that the trial court's failure to instruct that a felony-murder special circumstance requires the jury to find that he had the specific intent to kill[4] and retroactive application of *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*) to his case violates the ex post facto clause in article I of the United States Constitution and the due process clauses of the Fifth and Fourteenth Amendments.

In 1981, section 190.2 provided in pertinent part:

"(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the

---

[4] Defendant's jury was instructed with CALJIC No. 8.81.17, rape-murder and sodomy-murder special circumstances, which advised that proof of the special circumstances had two elements: "One, the murder was committed while the defendant was engaged in or in the commission or attempted commission of a rape [sodomy]. Two, the murder was committed in order to carry out or advance the commission of the crime of rape [sodomy] or to facilitate the escape therefrom and to avoid detection."

possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4 to be true: [¶] . . . [¶]

"(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: [¶] . . . [¶]

"(iii) Rape in violation of Section 261.

"(iv) Sodomy in violation of Section 286." (§ 190.2, as added by Prop. 7 as approved by voters, Nov. 7, 1978.)

Defendant claims that the jury should have been instructed in accordance with the holding of *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*) that in order to find a felony-murder special circumstance true, the jury must find that the defendant had the intent to kill at the time of the felony. That ruling was made retroactive to all cases not yet final in *People v. Garcia* (1984) 36 Cal.3d 539, 549–558 [205 Cal.Rptr. 265, 684 P.2d 826] (*Garcia*). Failure to so instruct was reversible error per se unless one of four exceptions were applicable. However, in *Anderson, supra,* 43 Cal.3d at page 1147, the court held that with respect to the actual killer, the court need not instruct on intent to kill on a felony-murder special circumstance.

Defendant admits that the California Supreme Court has rejected equivalent arguments in *People v. Kaurish* (1990) 52 Cal.3d 648, 696–697 [276 Cal.Rptr. 788, 802 P.2d 278] and *People v. Poggi* (1988) 45 Cal.3d 306, 326–327 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*). He also recognizes the binding effect of those rulings on this court pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]. Nevertheless, defendant "presents the arguments in order to exhaust his state remedies."

The Supreme Court has recognized a four year window of nonretroactivity between the time *Carlos* was decided and the time it was disapproved in *Anderson.* (See *People v. Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) During the four year *Carlos* "window," the requirement of intent to kill for a felony murder special circumstance was unambiguously and consistently applied in accord with the court's express holding. (*In re Baert* (1988) 205 Cal.App.3d 514, 518–520 [252 Cal.Rptr. 418].) Thus, *Anderson* constituted an unforeseeable judicial enlargement of the statute, which could not be applied retroactively to crimes committed during the period between the *Carlos* and *Anderson* decisions. (*People v. Fierro, supra,* 1 Cal.4th at p. 227.)

However, for crimes committed before the *Carlos* decision, the Supreme Court has held that retroactive application of the *Anderson* decision does not violate due process. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1151 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Nor was the holding in *Anderson* unforeseeable for crimes arising pre-*Carlos*. "Defendant stands convicted of a murder that preceded *Carlos*. *Carlos* itself concluded that the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circumstance. [Citation.] There was ample basis for pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer." (*Poggi, supra,* 45 Cal.3d at p. 327.)

Nevertheless, defendant claims application of *Anderson* to his case violates the prohibition against ex post facto laws because it adversely affects the severity of his sentence. This claim was also rejected in *People v. Ramos, supra,* 15 Cal.4th at page 1151. "[S]ince *Carlos* was not the law when defendant committed his crime, application of *Anderson* raises no ex post facto concerns."

Defendant next asserts that "*Poggi* failed to cite or discuss *Marks v. United States* (1977) 430 U.S. 188 [51 L.Ed.2d 260, 97 S.Ct. 990], wherein a reinterpretation of federal obscenity law was held to be an unforeseeable legal development, despite having been foreshadowed by concurring opinions in a prior case in which the plurality had interpreted the law more narrowly." Furthermore, defendant states the *Poggi* analysis ignores the legal effect of *Carlos* and *Garcia* on crimes committed before *Carlos*. Defendant states that by virtue of *Garcia*, the definition of capital murder at the time of *Poggi*'s and his crimes included intent to kill. Consequently, retroactive application of *Anderson* to his case deprives him of federal due process. That argument also was rejected by *Poggi, supra,* 45 Cal.3d at page 327.

Next, defendant states he is not being treated equally with other perpetrators of 1981 felony murders. Some of those defendants "would have had early trials, at which a court might or might not have instructed on intent to kill, but defendants denied an instruction on intent-to-kill would have had appeals decided after *Carlos* and would have benefited from the *Carlos* ruling. [¶] Others among the defendants would have been arrested and had their trials on or after December 12, 1983 (when *Carlos* was decided) and before October 13, 1987 (when *Anderson* was decided), and they, too, would have benefited from *Carlos*. [¶] . . . Yet [defendant], arguably with an indistinguishable felony-murder, on an equivalent date, *with an identical mental state*, would find his attempt to resist life-without-parole defeated by the interpretation of the same language, by the same tribunal, on the same point, in a case decided before he was arrested. Because other defendants' arrests occurred more quickly, or because their appellate records were prepared more

quickly, equally irrelevant matters happened to occur, a defendant such as [defendant] could not be parole-eligible, while his more fortunate counterpart[s] would be. Such arbitrariness is little different from selecting sentences by lot, and it is not tolerated by the Fourteenth Amendment." (Original italics.)

■ "The equality guaranteed by the equal protection clauses of the federal and state Constitutions is equality under the same conditions, and among persons similarly situated." (*Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 659 [34 Cal.Rptr.2d 641, 882 P.2d 358].) Accordingly, "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].) Defendant, who committed his crime before the *Carlos* decision and was tried after the *Anderson* decision, had fair notice that intent to kill was not an element of the felony-murder special circumstance. Thus, he is not similarly situated to those defendants who fall within the *Carlos* window. In *People v. Whitt* (1990) 51 Cal.3d 620, 636–637 [274 Cal.Rptr. 252, 798 P.2d 849], the Supreme Court held that a defendant who committed his crime pre-*Carlos* was not entitled to the benefit of *Carlos* on retrial, even though his initial conviction was vacated for *Carlos* error. The court stated the defendant was not immune from unfavorable changes in the law. "Obviously, *Anderson* is an intervening, controlling change in the law. It corrected prior mistaken assumptions about the 1978 state statute and federal case law, and concluded that intent to kill is not an element of the felony-murder special circumstance for actual killers." (*Id.* at p. 639.) The court did not err in instructing the jury.

## PRETRIAL TIME CREDITS

Finally, defendant claims the trial court erred in failing to allow any local credits beyond actual custody credits. He states that when he was sentenced, he was entitled to full credits under section 4019. The trial court awarded defendant 476 days of actual presentence custody credit against his sentence of life without the possibility of parole. The court declined to award "good time" or "work time" credits for the time spent in presentence custody.

Section 4019 sets forth a statutory scheme for presentence custody credits. In 1981, at the time of defendant's offense, section 4019 provided that a defendant shall receive one-for-six days' credit for "good behavior" (subd. (c)) and one-for-six days' credit for "work time" (subd. (b)) for prisoners

"confined in or committed to a county jail . . . , including all days of custody from the date of arrest to the date on which the serving of the sentence commences, under a judgment of imprisonment, or a fine and imprisonment until the fine is paid in a criminal action or proceeding." (§ 4019, subd. (a)(1), as amended by Stats. 1978, ch. 1218, § 1, p. 3941.)[5] Section 2931 provided that a defendant who makes bail or is released on his own recognizance, then is tried, convicted of a felony, and sentenced to state prison receives conduct credit against his full sentence.

By its terms, section 4019 applied only to a prisoner confined in jail under a judgment of imprisonment from a misdemeanor proceeding. (*People v. Sage* (1980) 26 Cal.3d 498, 504 [165 Cal.Rptr. 280, 611 P.2d 874] (*Sage*).) Section 2931 applied to felony defendants who were released pretrial. Only the presentence detainee eventually sentenced to prison did not receive conduct credit against his full sentence because he is denied credit for his presentence confinement. Thus, in 1981 at the time of defendant's offense, there was no express statutory entitlement for felons awaiting trial to receive presentence conduct credits. (*Ibid.*)

In *Sage*, the California Supreme Court held that principles of equal protection required awarding presentence conduct credits to detainees await-ing trial on felony offenses. The *Sage* holding, however, did not extend to felons sentenced to an indeterminate life term. As explained in *People v. Garcia* (1981) 115 Cal.App.3d 85 [171 Cal.Rptr. 169], "Penal Code section 2931, by its terms, applies only to persons sentenced pursuant to Penal Code section 1170. Appellant was sentenced to a term of straight life imprisonment pursuant to former Penal Code section 190 and Penal Code section 1168, subdivision (b). [¶] At the time that appellant committed her offense there was no statutory provision for awarding life prisoners conduct credits. (See former § 190, Stats. 1977, ch. 316, § 5, pp. 1256–1257.) Thus, there was no arbitrary discrimination between classes of life prisoners. The legislative distinction made was between persons sentenced to straight life imprisonment and other felons. " (*Id.* at pp. 112–113, fn. omitted, disapproved on another ground in *People v. Marsh* (1984) 36 Cal.3d 134 [202 Cal.Rptr. 92, 679 P.2d 1033]; see also § 2931, subd. (a), as added by Stats. 1976, ch. 1139, § 276, p. 5146; amended by Stats. 1977, ch. 2, § 4, p. 661 [authorizing prison good time/work time credits "[i]n any case in which an inmate was sentenced to the state prison pursuant to Section 1170"].)

---

[5] Defendant relies on section 4019, subdivision (a)(4), for his argument that good time/work time credits should be awarded to any person "confined in a county jail . . . following arrest and prior to the imposition of sentence for a felony conviction." However, this provision and subdivision (f) were enacted in 1982 after the commission of defendant's offense. (Stats. 1982, ch. 1234, § 7, p. 4553.)

Other provisions of the Penal Code dealing with good time/work time credits were in accord. At the time of defendant's offense, section 2900.5 (added by Stats. 1971, ch. 1732, § 2) required the trial court to award conduct credits under section 4019 as against a "term of imprisonment." Section 2900.5, subdivision (c) defined "term of imprisonment" to include "any period of imprisonment including any period of imprisonment prior to release on parole and any period of imprisonment and parole, prior to discharge, whether established or fixed by statute, by any court, or by any duly authorized administrative agency." This definition excluded sentences without the possibility of parole. (See § 190, as added by § 2 of Initiative measure approved Nov. 7, 1978; amended by Stats. 1987, ch. 1006, § 1, Prop. 67, approved Jan. 7, 1989 [stating that the provisions of former section 2930 shall apply only to reduce "any minimum term of 25 or 15 years in a state prison imposed pursuant to this section"].)

■ At the time of defendant's offense, he was not entitled to section 4019 presentence custody credits under the statutory scheme nor as a matter of equal protection under the *Sage* holding. Rather, his sentence of life in prison without the possibility of parole rendered him statutorily ineligible for credits under both sections 4019 and 2931. (*People v. Garcia, supra,* 115 Cal.App.3d at p. 113.) The trial court did not err in refusing to award good/time/work time credits under section 4019 against defendant's term of life imprisonment without the possibility of parole. There was no error.

## DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

On February 5, 2004, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 14, 2004. Kennard, J., was of the opinion that the petition should be granted.