Filed 11/14/14  P. v. Farley CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRAIG FARLEY,<br><br>    Defendant and Appellant. | D062857<br><br><br><br>(Super. Ct. No. SCD229026) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed and remanded with directions.

Boyce & Schaefer and Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury found Craig Farley guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] (count 1), robbery (§ 211) (count 2), and burglary (§ 459) (count 3).  In addition, the jury found that Farley committed the murder while engaged in a robbery and a burglary, within the meaning of section 190.2, subdivision (a)(2).  With respect to all three counts, the jury found that Farley committed the offenses for the benefit of a criminal street gang (§186.22, subd. (b)(1)).  The jury further found that Farley committed each of the offenses while acting as a principal and another principal used a firearm (§ 12022.53, subds. (b), (e)(1)); while acting as a principal and another principal personally discharged a firearm (§ 12022.53, subds. (c), (e)(1)); and while acting as a principal and another principal personally used a firearm proximately causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)).[2]  Farley also admitted that he had suffered a prior strike conviction.

On count 1, the trial court sentenced Farley to life in prison without the possibility of parole, plus a consecutive determinate sentence of 25 years to life. The trial court stayed execution of the sentences on the remaining counts pursuant to section 654.

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2]     The jury found not true allegations that Farley personally used a firearm as specified in section 12022.53, subdivisions (b), (c), and (d) (counts 1-3), and section 12022.5, subdivision (a) (count 3).

2

On appeal, Farley contends that the trial court erred in denying his motion for new trial, which was based on defense counsel's alleged ineffective assistance. Farley also contends that the trial court erred in permitting the People to present gang expert testimony; failing to question a juror about a potential instance of juror misconduct; permitting the People to present evidence of Farley's tattoos; and excluding potential third-party culpability evidence. In addition, Farley claims that the abstract of judgment should be amended to strike a parole revocation fine because Farley was sentenced to life without the possibility of parole.

We affirm the judgment, but direct the trial court to prepare a new abstract of judgment striking the parole revocation fine.

## II.

## FACTUAL BACKGROUND

A.   *The murder*

Victim Jonathan Pleasant sold marijuana from his apartment. He often possessed considerable amounts of marijuana, which he kept in a backpack, as well as large amounts of cash. Pleasant kept a gun by his bed, and sometimes carried the gun on his person.

Pleasant spent the evening of June 28, 2010 at home with his girlfriend, Esther Magnus. During the evening, Pleasant left the apartment with about $2,000 in cash. He returned with several bags of marijuana. At about 10:30 p.m. that evening, Farley came to Pleasant's apartment. While at the apartment, the two men smoked marijuana and

3

discussed a marijuana purchase. Farley said that he did not have money, but that he would return. Ten minutes later, Farley returned and told Pleasant that he would come back the following morning to buy the marijuana. Farley departed the apartment.

The next morning, Pleasant and Magnus discussed their plan to go out together that day. At approximately 11:15 a.m., Magnus left Pleasant's apartment. The two planned for Pleasant to meet Magnus at her residence just after noon. Magnus testified that before she left, Pleasant told her that he was waiting for Farley to come to the apartment. Pleasant also told Magnus that his friend, Corey Wishom, was planning to stop by the apartment, as well.

As Magnus was leaving, Pleasant's neighbor, Mark Dobie, came to the apartment and smoked marijuana with Pleasant. While the two visited, Pleasant received a phone call. Dobie heard Pleasant tell the caller to "hurry up and come" because Pleasant had to leave soon.

Soon thereafter, Wishom arrived at Pleasant's apartment. Dobie met Wishom and then went back to his own apartment. Pleasant showed his marijuana to Wishom, who purchased some. Following a short visit, Wishom said goodbye to Pleasant and began to leave the apartment.

As Wishom was leaving, two men arrived at Pleasant's door. Pleasant said to one of the men, "Oh, I've been waiting for you." One of the men stepped into the living room and said, "This is my brother and he's cool." Wishom testified that both men were African-American. The man who said, "[t]his is my brother and he's cool" was wearing

4

black Nike shoes, black basketball shorts, white socks pulled up to his knees, a black hoodie, and a backpack strapped to his chest. The man had short clipped hair and a tattoo on the top of one of his arms. Apart from his race, Wishom was unable to provide any further description of the second man. After this short encounter, which occurred at approximately 11:30 a.m., Wishom left the apartment.

Pleasant's neighbor, Lynshel Reid-Jones, testified that at about this time, she heard a melee and a loud "boom" come from Pleasant's apartment. Reid-Jones then heard Pleasant crying for help. Reid-Jones looked outside and saw two young African-American males sprinting from Pleasant's apartment with a backpack that she believed belonged to Pleasant.

At 11:44 a.m., Dobie received a phone call from his sister, Breanna Sandle, saying that she had just seen two men running from the apartment complex and that it appeared that someone had been robbed. Sandle testified that she saw two African-American males, who appeared to be in their 20s, running from the apartment complex. One of the men was wearing a backpack. When shown a photographic lineup by police, Sandle focused on two of the photographs, one of which depicted Farley, before telling the officer that she could not be sure whether he was one of the men she had seen fleeing the apartment complex.

Immediately after the shooting, several neighbors attempted to help Pleasant, who was bleeding profusely. Pleasant cried, " 'They shot me. They shot me. Oh, God, they

5

shot me.' " Emergency personnel responded to the apartment and pronounced Pleasant dead at the scene.

B.    *The crime scene*

Investigators determined that Pleasant sustained a large gunshot wound to his right buttock. The nature of the wound suggested that Pleasant had been shot from a range of approximately one to three feet away. Pleasant also suffered blunt force trauma to his head, consistent with his having been struck by a gun.

Pleasant's apartment was in disarray, consistent with a struggle or fight having occurred. Police found a slide from a firearm, handcuffs, and a handcuff key in a hallway. Police also found an open, empty safe on the floor of a bedroom and a bag of marijuana on the living room floor. In addition, police found a black Pittsburgh Pirates baseball cap in the living room and a roll of duct tape in the bathroom.[3]

C.    *DNA and fingerprint evidence*

Investigators determined that Farley's DNA was on the duct tape. Police found DNA from a person named Pierre Terry on the baseball cap. Terry's DNA was also found on the gun slide, on blood samples collected from the apartment, and in fingernail scrapings taken from Pleasant. Terry's fingerprints were also found on artwork in the living room.

---

[3]    Magnus testified that when she left Pleasant's apartment shortly before he was shot, the roll of duct tape was not in the bathroom.

D.    *Cell phone records*

On the morning of the murder, several short calls were made between Farley's and Pleasant's cell phones, between 10:37 a.m. and 10:39 a.m.  At 11:30 on the morning of the murder, the signal from an outgoing phone call made on Farley's phone that lasted 59 seconds terminated at a cell phone tower located on Pleasant's apartment building.  A text message was sent from Terry's phone to Farley's phone at 11:33 a.m.  From 11:31 a.m. until 11:48 a.m. there was no activity on Farley's cell phone.[4]  Beginning at 11:50 a.m., Farley and Terry exchanged numerous text messages.  Less than two hours later, a request was made to Farley's cell phone provider for a new phone number.  The request was granted.  Cell phone records for Farley's new cell phone number showed him leaving California the following morning and traveling across the United States to Louisiana.

E.    *Farley's arrest, escape and rearrest*

Approximately a month and a half after the murder, authorities in Baton Rouge, Louisiana arrested Farley and took him to a police station.  Farley escaped from the station and ran down a nearby street.  With the assistance of a police dog, police found Farley hiding in a garbage can.

While being transported back to San Diego, Farley asked one of the officers if he could be charged with a gang crime because the other defendant was a gang member.

---

[4]    In their briefing, the parties do not address the discrepancy in testimony that a text message was sent to Farley's phone at 11:33 a.m. and testimony that there was no activity on Farley's phone between 11:31 a.m. and 11:48 a.m.

While the officer had made some statements about the case to Farley, he had not said anything to Farley about the other defendant in the case being a gang member.

Police found several items in a Baton Rouge hotel room where Farley had been staying, including a laptop computer. It was later determined that searches had been performed on the computer related to the murder and the ensuing investigation.

F.    *Gang Evidence*

Detective Joseph Castillo of the San Diego Police Department testified as a gang expert. Detective Castillo stated that the Skyline "Piru" gang is the largest African-American gang in San Diego. Gang members wear the color red and sometimes wear Pittsburgh Pirates baseball caps. Detective Castillo stated that the primary activities of the Skyline Piru gang include murder and robbery.

Castillo testified that Pierre Terry is a documented Skyline gang member and that Farley also appeared to be a Skyline Piru gang member, although he had not previously been documented. In addition, as described in greater detail in part III.E., *post*, Castillo offered his opinion that a hypothetical crime based on the evidence in this case would benefit, promote, assist and further the criminal conduct of the Skyline Piru gang.

III.

DISCUSSION

A.    *The trial court did not err in denying Farley's motion for new trial, which was based on defense counsel's alleged ineffective assistance*

Farley filed a motion for new trial in which he contended that defense counsel had provided ineffective assistance in failing to present certain exculpatory evidence at trial. Farley contends that the trial court erred in denying the motion for new trial.

1.    *Governing law and standard of review*

A trial court shall grant a motion for new trial where the trial court finds that the defendant received ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) In order for a defendant to demonstrate that he received ineffective assistance of counsel, he must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686.)

In resolving a claim of ineffective assistance of counsel, a court is to give great deference to counsel's reasonable tactical decisions and indulge in the " ' " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) This presumption is warranted "because it is all too easy to conclude that a particular act or omission of

9

counsel was unreasonable in the harsh light of hindsight." (*Bell v. Cone* (2002) 535 U.S. 685, 702.) Accordingly, "a court must 'view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act.' " (*In re Scott* (2003) 29 Cal.4th 783, 812.)

When, as in this case, a trial court has denied a motion for new trial based on a claim of ineffective assistance of counsel, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent that they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts established demonstrate a violation of the right to effective counsel and prejudice. (See *People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725 (*Taylor*).)[5]

> 2. *Defense counsel did not provide ineffective assistance in failing to present evidence that two witnesses failed to identify Farley in a live police lineup*

Farley contends that defense counsel provided ineffective assistance in failing to present evidence that Wishom and Sandle failed to identify him in a live police lineup.

> a. *Factual and procedural background*

At trial, neither Wishom nor Sandle was able to identify Farley as a person that they had seen on the day of the murder. When asked about a photographic lineup that

---

5     This standard differs from the abuse of discretion standard applicable to orders *granting* a motion for new trial based on ineffective assistance of counsel (see, e.g., *People v. Callahan* (2004) 124 Cal.App.4th 198, 209) and orders denying a motion for new trial on *statutory* grounds not implicating a constitutional right. (See *Taylor, supra*, 162 Cal.App.3d at p. 723.)

police had shown him after the murder, Wishom testified that he told police that Farley looked familiar in that he resembled a person who Wishom had seen on television. Sandle testified that when she was shown the photographic lineup, she was unable to identify anyone as being a person she had seen on the day of the murder. However, Sandle acknowledged that she had selected Farley's photograph and the photograph of another individual as possibly being one of the persons she saw on the day of the murder.

In his motion for new trial, Farley contended that defense counsel should have presented evidence that both Wishom and Sandle had failed to identify Farley in a live police lineup, and that Wishom had tentatively identified two other people in the lineup as potential suspects.

At the hearing on the motion for new trial, defense counsel testified as to the reasons why he did not present evidence that Wishom and Sandle had failed to identify Farley in a live police lineup, as follows:

> "[The prosecutor]: Now, did you consider presenting [the] absence of identification at these live lineups as additional evidence in this case?
>
> "[Defense counsel]: I considered it, yes.
>
> "[The prosecutor]: And did you decide not to?
>
> "[Defense counsel]: Yes.
>
> "[The prosecutor]: Why?
>
> "[Defense counsel]: Because none of those witnesses identified him at trial. None of them made an in-court identification of Mr. Farley as the offender at trial. And given that nobody in the courtroom was

11

pointing the finger at him as an offender in the case, I didn't want to go back and rehash the police's suspicion that he'd been one of the offenders and had been at a lineup. I made a conscious decision not to present that evidence."

Defense counsel also stated that he had not wanted to provide Wishom or Sandle the opportunity to reconsider their inability to identify Farley.

The trial court concluded that defense counsel should have presented the evidence of the witnesses' failure to identify Farley at the live lineup, and that counsel had not made a reasonable tactical decision in failing to do so. However, the court further concluded that introduction of the evidence would not have made a difference in the outcome of the trial, and denied the motion for new trial as to this claim.

b.    *Application*

Farley contends that defense counsel provided ineffective assistance in failing to present the evidence of the witnesses' failure to identify him. He argues that the evidence could have been presented through the testimony of the officers who conducted the lineup, thus eliminating the possibility that either witness could have reconsidered whether they could identify Farley.

At the hearing on the motion for new trial, defense counsel explained that he had made a "conscious decision" not to offer the lineup evidence because neither Wishom nor Sandle had identified Farley at trial, and defense counsel did not want to emphasize to the jury that the police had considered Farley a suspect in the immediate aftermath of the murder. Given that neither witness had identified Farley during direct examination at

12

trial, Farley's trial counsel could have reasonably determined that additional evidence of the witnesses' failure to identify Farley was likely to be of marginal benefit to the defense. Against this limited potential benefit to be gained by presenting the evidence, trial counsel reasonably considered the possibility that such evidence would emphasize to the jury that the police considered Farley a suspect from the outset.

Without endorsing defense counsel's tactical decision, in light of the broad deference we accord to such decisions, we conclude that counsel's decision not to present the lineup evidence did not fall below "prevailing professional norms." (*People v. Hinton, supra*, 37 Cal.4th at p. 876; see *ibid*. [" ' "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" ' "].) Thus, even assuming that Farley is correct that the evidence of the witnesses' failure to identify him at the live lineup could have been presented though the testimony of the officers who conducted the lineup, we reject Farley's claim that defense counsel provided ineffective assistance in failing to present evidence that two witnesses who failed to identify him at trial also failed to identify him at a police lineup.

3. *Defense counsel did not provide ineffective assistance in failing to present evidence that Farley made numerous telephone calls to his wife in Louisiana in the months prior to the murder*

Farley contends that defense counsel was ineffective in failing to present evidence that he made numerous cellular telephone calls to his wife in Louisiana in the months prior to his trip to Louisiana. Farley contends that the introduction of this evidence

13

would have bolstered defense counsel's argument that Farley had planned the trip to Louisiana, prior to the date of the murder, to visit his wife rather than to flee California after committing the murder.

a.      *Factual and procedural background*

The People presented cellular phone record evidence to demonstrate that on the morning after the murder, Farley left San Diego and traveled to Louisiana, where he remained until his arrest approximately two months later.  The prosecutor argued that Farley's flight to Louisiana evinced a consciousness of guilt.  The jury was instructed that it could use evidence of Farley's flight to infer a consciousness of guilt on his part.

In his motion for new trial, Farley maintained that defense counsel was ineffective in failing to offer in evidence additional cell phone records that would have demonstrated that Farley had made numerous calls to his wife in Louisiana in the months prior to the murder.  Farley contended that this evidence would have provided an innocent explanation for his trip to Louisiana.

At the hearing on the motion for new trial, defense counsel explained that prior to trial, Farley had told him that the trip to Louisiana had been preplanned, and that he had taken the trip in order to "celebrate his anniversary with his wife," from whom he was separated.  Farley also told defense counsel that he had travelled to Louisiana with his girlfriend, who was a prostitute, so that she could provide him with "female companionship" on the way.  In addition, defense counsel stated that until a week before trial, Farley told defense counsel that he intended to testify at trial.  Accordingly, defense

14

counsel anticipated that Farley's explanation for the Louisiana trip would be presented to the jury through his testimony. Defense counsel explained that Farley changed his mind and decided not to testify approximately a week before the trial. (RT 2551, 2564)!

In the wake of Farley's decision not to testify, defense counsel explained that he decided not to present evidence of the Louisiana trip to the jury because he found Farley's explanation for its purpose "preposterous," and counsel did not believe that the explanation would be well received by the jury. Defense counsel also explained that several of the witnesses who might be relevant to the presentation of Farley's explanation of the trip to the jury, including Farley's former wife and his girlfriend, would likely not be seen as credible witnesses by the jury.

In denying his motion for new trial, the trial court noted that evidence that Farley had been communicating with his wife in Louisiana prior to the murder might explain why he went to Louisiana rather than to another location, but that such evidence would not necessarily explain his decision to leave San Diego.

b.      *Application*

Defense counsel's decision not to emphasize Farley's trip to Louisiana was a reasonable one. As the trial court stated in ruling on the motion for new trial, while evidence that Farley's wife lived in Louisiana might have explained why he went to Louisiana rather than to some other location, that fact is not inconsistent with the People's theory that Farley fled San Diego because he had committed the murder. In addition, evidence that Farley had made numerous telephone calls to Louisiana in the months prior

15

to the murder did not the lessen the impact of the most inculpatory aspect of the Louisiana evidence, namely, that Farley left San Diego for Louisiana *the day after the murder.* Further, defense counsel reasonably decided that it would not be in Farley's interest to present additional evidence of the Louisiana trip in light of counsel's assessment that Farley's explanation for the trip was "preposterous," and the possibility that the presentation of such evidence might permit the People to present rebuttal evidence demonstrating the lack of credibility of the explanation. Under these circumstances, defense counsel's decision not to present evidence of Farley's telephone calls to his wife in Louisiana was a reasonable tactical one. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 765 [concluding defense counsel did not provide ineffective assistance in failing to present certain potentially exculpatory evidence where "counsel's decision not to elicit this evidence was a reasonable tactical decision"].)

Accordingly, we conclude that defense counsel did not provide ineffective assistance by failing to present evidence that Farley made telephone calls to his wife in Louisiana in the months prior to the murder, for the purpose of explaining to the jury why Farley travelled to Louisiana on the day after the murder.

4.    *Defense counsel did not provide ineffective assistance in failing to present evidence that Farley's mother and father informed him that the police were investigating him in connection with Pleasant's murder*

Farley contends that defense counsel was ineffective in failing to call his mother and father as witnesses in order to testify that they informed him that the police were investigating him in connection with Pleasant's murder. Farley contends that the

16

presentation of their testimony was necessary to provide an innocent explanation for evidence demonstrating that Farley had performed computer searches related to the murder.

a.     *Factual and procedural background*

The People presented evidence that Farley's computer had been used to perform several searches, including internet searches related to the shooting, searches on the San Diego County Sheriff's Web site to determine whether an arrest warrant had been issued for Farley, and a search of a Web site to determine whether Terry was in jail.

In his motion for new trial, Farley contended that defense counsel had failed to call Farley's mother and father as witnesses to testify that they told Farley about various aspects of the police investigation into the murder. In support of the motion, Farley's mother provided a declaration in which she stated that she had informed Farley about the execution of a search warrant related to the murder, and that Terry had been arrested for the murder. Farley's mother also stated that she told Farley that an attorney had advised her to check the sheriff's Web site in order to determine whether an arrest warrant had been issued for Farley. Farley's father stated that after he learned that Terry had been arrested, he told Farley about the existence of the "Who's In Jail" Web site. Farley argued that testimony from his parents would have provided an explanation for why he had conducted the computer searches.

At the hearing on the motion for new trial, defense counsel acknowledged that the computer searches had presented a "difficult" issue for the defense. Defense counsel

stated that he had spoken with Farley's parents on numerous occasions. Defense counsel stated that Farley's mother did not seem to be interested in providing counsel with information to assist in Farley's defense. Counsel also stated that he found Farley's mother to be "hostile" and adjudged her as likely to be a "terrible witness." Defense counsel stated that Farley's father was "much more reticent in demeanor than Mrs. Farley," and that he "had little to say." Counsel also stated that he did not recall any discussions with Farley's father concerning communications between Farley and his father while Farley was in Louisiana.

The trial court ruled that defense counsel's decision whether to call Farley's parents as witnesses was a matter of trial tactics and that his failure to call them as witnesses did not amount to ineffective assistance. The trial court also noted that while defense counsel had not formally interviewed Farley's parents, any omission in this regard was not prejudicial.

b.    *Application*

"Whether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate." (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) In the hearing on the motion for new trial, defense counsel testified that he had spoken with Farley's mother on several occasions before the trial and that he judged her to be a "terrible" potential witness. Defense counsel explained that Farley's mother was "hostile, aggressive, and very difficult to deal with." Defense counsel's decision not to call Farley's mother as a witness was a reasonable tactical choice given

18

counsel's assessment of her demeanor, and also because of the fact that evidence that she had informed Farley of the police investigation would not necessarily be inconsistent with Farley's guilt. Accordingly, we may not second-guess defense counsel's decision not to call Farley's mother as a witness. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ["The decision[] . . . whether to put on witnesses [is a] matter[] of trial tactics and strategy which a reviewing court generally may not second-guess"].)[6]

With respect to his father, Farley does not contend that defense counsel could have adequately presented an explanation for Farley's computer searches solely through his father's testimony. On the contrary, he argues that Farley's *mother's* testimony "was critical to establish how her son learned about the homicide." Thus, Farley has not established that defense counsel was ineffective in failing to call his father as a witness.

Accordingly, we conclude that defense counsel did not provide ineffective assistance by failing to present evidence that Farley's mother and father informed him that the police were investigating him in connection with Pleasant's murder.[7]

---

[6]    Farley does not contend on appeal that defense counsel failed to properly investigate Farley's parents as potential witnesses.

[7]    In light of our conclusion, we need not consider the People's contention that Farley cannot prevail on his ineffective assistance of counsel claim on this ground because defense counsel's presentation of this evidence would have violated counsel's ethical obligations since defense counsel "knew that [Farley] was involved and had participated in Pleasant's murder."

19

B.      *The trial court did not err in admitting gang expert testimony*

Farley claims that the trial court erred in admitting portions of Detective Castillo's gang expert testimony. We review the trial court's ruling for an abuse of discretion. (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1223.)

1.      *Governing law and standard of review*

In *People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*), the California Supreme Court concluded that an expert on criminal street gangs may testify that a charged gang crime was gang related, as long as the testimony is based on assumed hypothetical facts rooted in the evidence. The *Vang* court described a portion of the expert testimony at issue in that case as follows:

> "On direct examination, the prosecutor asked about a hypothetical assault on a 'young baby gangster.' After stating the hypothetical facts, the prosecutor asked: 'Based on the facts of that hypothetical, do you have an opinion as to whether *this particular crime* was committed for the benefit of and [in] association with or at the direction of the *Tiny Oriental Crips* street gang?' Detective Hatfield said he did have an opinion based on those facts. He believed that 'they did this to keep the gang strong because the gang set is only as strong as its weakest member. And that member did something to the TOC gang for him to be victimized *in this case*. They put him in check. They brought him back in line over some perceived wrong that this individual did to that set, and the victim may not even know what he or she did in this incident.' He stated that the assault *would benefit TOC* and was committed *in association with TOC* and at the *direction of TOC members*." (*Id*. at p. 1043, italics added.)

As the italicized portion of the quotation above demonstrates, the expert in *Vang* offered his opinion that the *charged crime* was committed by the defendant, based on a set of assumed hypothetical facts rooted in the evidence. The *Vang* court rejected the

20

defendant's claim that " 'the trial court abused its discretion when it allowed Detective Hatfield to testify in response to a hypothetical question that the assault on Phanakhon, thinly disguised in the hypothetical as "young baby gangster," was for the benefit of TOC and was gang motivated.' " (*Vang, supra*, 52 Cal.4th at p. 1044.) The *Vang* court explained that since Detective Hatfield had no personal knowledge as to whether defendant committed the charged crime, he could not offer his opinion as to whether the defendant actually committed the crime. However, the *Vang* court explained that the expert "could, and did, express an opinion, based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Id*. at p. 1048.)

2.      *The challenged testimony*

As noted in part II.F., *ante*, Detective Castillo testified as a gang expert. As Farley states in his brief, "The prosecutor asked Detective Castillo . . . about a hypothetical robbery of a drug dealer committed by a Skyline gang member and another person who is not a documented gang member, and whether the crime would benefit the Skyline Piru street gang." Detective Castillo testified that such a hypothetical crime would be gang related, and would benefit the gang "by gaining respect and money for the gang."

21

On appeal, Farley contends that the trial court erred in admitting Detective Castillo's "inadmissible opinions" concerning whether the charged offenses were gang related, including the following:[8]

> "[The prosecutor]: Okay. *Based upon your review of the police reports in this case*, coupled with the brief hypothetical I gave you, okay, assuming one person is a documented Skyline gang member, the other person hasn't been documented, okay, do you have any opinion as to whether or not the information that you reviewed from the homicide books and that you testified to on a prior occasion, coupled with this brief hypothetical, can you give us a brief opinion as to whether or not you believe that *this* crime was committed in association with a criminal street gang?
>
> "[Defense counsel]: Objection; it's improper opinion.
>
> "The Court: Overruled.
>
> "[Detective Castillo]: Yes it is.
>
> "[The prosecutor]: Okay. What is your opinion based upon?
>
> "[Detective Castillo]: *Based upon the reports I've read, based upon the crime was done with a gang member, one of the subjects who did this crime was a gang member, documented Skyline gang member*.
>
> "[The prosecutor]: *Are you referring to Mr. Terry*?
>
> "[Detective Castillo]: *Yes, I am*.
>
> "[¶] . . . [¶]

---

[8]     In his brief, Farley quotes a lengthy portion of Detective Castillo's testimony, and suggests that the entire colloquy was inadmissible. We have considered this entire colloquy and conclude, for the reasons stated below, that the trial court did not err in admitting the testimony. We have quoted a representative sample of the colloquy in our opinion.

"[The prosecutor]: *Okay. Now, in that situation, what is it about this person's participation that leads you to the opinion that this crime was being committed in association, what is that other person doing?*

"[Detective Castillo]: He's committing a crime with a documented Skyline gang member and this crime is listed as . . . one of several crimes that are listed under 186.22, the gang.

"[¶] . . . [¶]

"[The prosecutor]: Detective Castillo, I'll ask you the question this way. Do you have an opinion as to whether or not *this incident, based upon all the materials that you reviewed*, the conversations with other law enforcement officers, your prior testimony in the preliminary hearing in this case, and the hypothetical that you've been presented, do you have an opinion as to whether or not *this conduct* would somehow promote, further or assist in criminal conduct by gang members?

"[Detective Castillo]: Yes.

"[The prosecutor]: Okay. First of all, *what is your opinion based upon*?

"[Detective Castillo]: *Through several pages of reports, I've read through discussions with homicide investigators who investigated this homicide, and basically all the reports, and talking with Detective Conley.*

"[The prosecutor]: *As well as other detectives on the homicide team*?

"[Detective Castillo]: *Yes*." (Italics added in Farley's brief.)

3. *Application*

Farley appears to make two arguments in support of his contention that the trial court erred in admitting Detective's Castillo's testimony. Farley suggests that the trial

23

court erred in permitting Castillo to testify that " 'this conduct,' 'this crime,' and 'this incident' " were committed for the benefit of the gang. We reject this argument because *Vang* makes clear that a gang expert is permitted to offer an opinion as to whether the *charged crime* was committed for the benefit of the gang, as long as the expert's opinion is based on assumed hypothetical facts rooted in the evidence. (*Vang, supra*, 52 Cal.4th at p. 1048.)

Farley also appears to contend that Detective Castillo's testimony was inadmissible because it was based on evidence in the case, rather than hypothetical questions based on the evidence in the case as required under *Vang*. We reject this contention, because a fair reading of the testimony to which Farley objects, including the prosecutor's repeated use of the word "hypothetical" during his direct examination of Detective Castillo makes clear that Castillo's testimony was consistent with *Vang* in that it was offered in response to "the prosecutor's hypothetical questions . . . based on what the evidence showed *these* defendants did, not what someone else might have done." (*Vang, supra*, 52 Cal.4th at p. 1046.)[9]

Accordingly, we conclude that the trial court did not err in admitting Detective Castillo's expert testimony.

---

[9] In his brief, Farley notes that Detective Castillo responded to questions about a "*hypothetical* robbery of a drug dealer . . . ." (Italics added.)

24

C.  *The trial court did not err in failing to hold a hearing to determine whether a juror was biased in light of a remark that the juror made during the prosecutor's closing argument*

Farley contends that the trial court erred in failing to hold a hearing to determine whether a juror was biased against Farley after the juror answered a rhetorical question posed by the prosecutor during his closing argument. We apply the abuse of discretion standard of review to Farley's claim. (See, e.g. *People v. Williams* (2013) 58 Cal.4th 197, 290 [" ' " 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court' " ' "].)

1.  *Factual and procedural background*

During the prosecutor's closing argument, the following exchange occurred:

> "[The prosecutor]: . . . But the important question you can't get around, and there's no reasonable alternate explanation for it, is why, why is he going to these databases? Because at the end of the day he's not just putting in Pierre Terry's name, is he? What other name did he put . . . in when it came time to look for warrants? Who was he worried about for getting warrants?
>
> "[Unidentified juror]: Himself.
>
> "[The prosecutor]: That's right, himself."

Defense counsel did not object to the juror's remark.

In a motion for new trial, Farley contended that the trial court had an obligation to either discharge the juror or, at a minimum, conduct an inquiry into the remark.

25

In the hearing on the motion for new trial, the trial court stated that it had heard the juror's remark. The court noted that defense counsel had not objected and that the court believed that defense counsel may have decided not to object in order to avoid highlighting the juror's response. The court explained that, in the absence of any objection, it had decided not "to step in and cause problems." Defense counsel testified that he had not heard the juror's remark.

2. *Governing law*

In general, juror misconduct occurs when there is a direct violation of the juror's oaths, duties, and instructions. (*In re Hamilton* (1999) 20 Cal.4th 273, 294; see also § 1122, subd. (b).) Under section 1122, subdivision (b), jurors commit misconduct when they "form or express any opinion about the case before the cause is finally submitted to them."

"A court on notice of the possibility of juror misconduct must undertake an inquiry sufficient ' "to determine if the juror should be discharged and whether the impartiality of other jurors ha[s] been affected." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 822.) However, "[n]ot every incident of potential misconduct requires further investigation. [Citation.] '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284 (*Virgil*).)

26

3. *Application*

The juror's remark was spontaneous, brief, and merely provided an answer to a rhetorical question posed by the prosecutor. Further, as the trial court noted, the question that the juror answered was "an issue that was not in any way in dispute." The juror's remark did not suggest that the juror had formed an opinion on the case, nor did it in any way suggest that good cause existed to remove the juror from the case. Accordingly, we conclude that the trial court clearly did not abuse its discretion in failing to hold a hearing to investigate the juror's comment. (See *Virgil*, *supra*, 51 Cal.4th at p. 1284.)

D. *The trial court did not abuse its discretion in admitting evidence of Farley's tattoos*

Farley contends that the trial court abused its discretion in admitting evidence of his tattoos. He maintains that the evidence was irrelevant and should have been excluded pursuant to Evidence Code section 352. We review the trial court's evidentiary rulings for abuse of discretion. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence and is particularly appropriate for questions regarding relevance and undue prejudice].)

1. *Factual and procedural background*

Prior to trial, defense counsel orally moved to exclude evidence of Farley's gang-related tattoos. Farley's tattoos include the acronym "M.O.B," which, according to Detective Castillo, is an acronym for "money over bitches," and "dead presidents."

In opposition, the People argued that the tattoos tended to prove Farley's status as a gang member, and were therefore relevant in proving the gang enhancement allegations. Specifically, the prosecutor argued that the tattoos demonstrated Farley's "devotion to acquiring even money over females and . . . his participation in Skyline pimping gang culture." The People also argued that the tattoos were relevant to prove Farley's desire for money and his motive to rob Pleasant.

The court tentatively ruled that the tattoo evidence was relevant to "gang involvement, gang activity," and that the evidence was not unduly prejudicial. However, the court reserved making a final ruling on the admissibility of the tattoos pending the court's viewing of photographs of the tattoos.

At trial, Wishom testified that he thought that one of the men who he saw with Pleasant just before the murder had a tattoo on the top of his arm. When the prosecutor sought to present photographs of Farley's tattoos to Wishom and the jury, defense counsel objected. The trial court overruled the objection and the prosecutor presented the photographs to Wishom and the jury. Wishom could not identify the particular tattoo that he had seen, but stated that one of Farley's tattoos appeared to be in a similar location on Farley's arm as the tattoo that he saw on the man that he saw with Pleasant just before the murder.

28

Detective Castillo testified that Farley had a tattoo with the initials, "M.O.B.," which Castillo explained was an acronym for "money over bitches." Castillo also stated that the acronym emphasized the importance of money in gang culture. Castillo further testified that Farley had other tattoos related to his desire to obtain money, including a tattoo depicting a gun and the words "dead presidents." Detective Castillo explained that Farley's tattoos did not signify his membership in any particular gang, but that gang members commonly had similar tattoos.

When the prosecutor formally offered photographs of the tattoos in evidence, defense counsel again objected, arguing that the evidence was "largely irrelevant," and that the photographs were inadmissible under Evidence Code section 352. The trial court overruled defense counsel's objections.[10]

2.    *Governing law*

a.    *Relevant principles of the law of evidence*

" ' " 'Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts . . . .' [Citation.]" [Citation.] The trial court has broad discretion in determining the

_____

[10]    Photographs of the tattoos have been transmitted to this court.

29

relevance of evidence . . . .' " ' "  (*People v. Richardson* (2008) 43 Cal.4th 959, 1000-1001.)

Evidence Code section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

b.     *The admissibility of evidence of a defendant's gang membership*

Evidence tending to demonstrate a defendant's membership in a gang is directly relevant to proving a gang enhancement under section 186.22, subdivision (b). (*People v. Gutierrez* (2009) 45 Cal.4th 789, 820 (*Gutierrez*).) "Evidence of the defendant's gang affiliation . . . can [also] help prove . . . motive, . . . specific intent, . . . or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Evidence that a defendant has gang-related tattoos tends to prove a defendant's membership in a gang. (See, e.g., *People v. Albillar* (2010) 51 Cal.4th 47, 62 (*Albillar*); *People v. Valdez* (2012) 55 Cal.4th 82, 131; *People v. Williams* (2009) 170 Cal.App.4th 587, 621.)

31

3. *Application*

Consistent with Detective Castillo's testimony, the trial court reasonably could have concluded that Farley's tattoos were common among gang members. Evidence that Farley had gang-related tattoos was highly relevant to demonstrate his membership in a gang (see *Albillar*, *supra*, 51 Cal.4th at p. 62), and thus was relevant in proving the gang enhancement. (See *Gutierrez, supra*, 45 Cal.4th at p. 820.) We reject Farley's contention that the court should have excluded the tattoo evidence pursuant to Evidence Code section 352 because the jury may have believed that the tattoos suggested that Farley was "greedy," that he valued money over "bitches," and/or that he was willing to obtain money through violence. Even assuming for purposes of this opinion that the tattoos were not admissible with respect to any of these issues, Farley could have requested that the court limit the purposes for which the jury could consider the tattoo evidence. No such request was made, and the trial court was not required to provide such a limiting instruction sua sponte. (See *People v. Smith* (2007) 40 Cal.4th 483, 516 ["Even assuming that defendant is correct in noting that the evidence should only have been admitted for a limited purpose, the trial court had no sua sponte duty to give a limiting instruction"].) Further, in light of the fact that the tattoo evidence was highly probative in proving the gang enhancement allegation, the trial court clearly was not required to exclude the tattoo evidence entirely.

32

Accordingly, we conclude that the trial court did not err in admitting evidence of Farley's tattoos.[11]

E.    *The trial court did not err in excluding Farley's proffered evidence of third-party culpability*

Farley claims that the trial court erred in denying his request to be allowed to present evidence that a third party might have committed the charged offenses. We review a trial court's ruling excluding proffered third-party culpability evidence for an abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

1.    *Governing law*

"[T]he Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant," or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 320 [stating that evidentiary rules that preclude the admission of third-party culpability evidence that does not sufficiently connect the third person to the crime are "widely accepted"].)

In *People v. Hall* (1986) 41 Cal.3d 826, 834 (*Hall*), the California Supreme Court stated, "[C]ourts should . . . treat third-party culpability evidence like any other evidence:

---

11    Farley claims that the trial court's alleged error in admitting the tattoo evidence violated his constitutional right to due process by rendering the trial fundamentally unfair. In light of our conclusion that the trial court did not abuse its discretion in admitting the evidence, it necessarily follows that the court did not violate Farley's constitutional right to due process by admitting the evidence. (See, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 93 ["Defendant further claims the introduction of this percipient evidence violated his right to due process under the Fourteenth Amendment to the federal Constitution. This claim fails because, as we have concluded, the evidence was properly admitted"].)

if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." In describing when such third-party culpability evidence is relevant, the *Hall* court held:

> "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* at p. 833.)

In *People v. DePriest* (2007) 42 Cal.4th 1, 43 (*DePriest*), the Supreme Court elaborated on its holding in *Hall*, stating, "Evidence that another person . . . had some 'remote' connection to the victim or crime scene[] is not sufficient to raise the requisite reasonable doubt. [Citation.] Under *Hall* and its progeny, third-party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.' " The *DePriest* court concluded that evidence that a third party was with the murder victim in her car, together with the defendant, on the night that she was murdered, was not relevant third-party culpability evidence. (*DePriest, supra*, at p. 44.)

Numerous courts have applied *Hall* in considering the admissibility of evidence of third-party culpability. For example, in *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1134-1138, the Supreme Court considered whether a trial court had erred in excluding

34

evidence that a third party involved in the trafficking of drugs might have killed the victim. In the trial court, the defendant offered to prove that the victim dealt in marijuana and other narcotics, and owed a large sum of money to a drug dealer. (*Id.* at p. 1135.) The defendant also proffered that the victim had asked him to provide armed protection for her during a drug transaction planned for the night before her murder, and that she had purchased ammunition for this purpose. (*Ibid.*) In addition, the defendant offered to prove that on the night before the murder, he and the victim met a Mexican man named Pablo for the purpose of consummating the drug deal, and that the transaction was postponed when the drugs did not arrive. (*Ibid.*) The Supreme Court concluded that the trial court did not err in excluding this evidence, reasoning that there was no evidence linking Pablo or any other third party to the victim near the time of her death. (*Id.* at p. 1137.)

In *People v. Adams* (2004) 115 Cal.App.4th 243 (*Adams*), the Court of Appeal applied *Hall* in concluding that a trial court had not erred in refusing to allow a defendant to present evidence that a former boyfriend of the murder victim might be responsible for the murder. The evidence included proffered testimony tending to show that the boyfriend had assaulted the victim in the past, as well as explicitly sexual drawings of the boyfriend found in the victim's room.[12] (*Id.* at p. 251.) The court reasoned in part, "[The boyfriend's] history of violence toward [the victim], without direct or circumstantial

---

[12]    The defense contended that the drawings demonstrated a continuing relationship between the victim and the boyfriend. (*Adams, supra,* 115 Cal.App.4th at p. 251.)

35

evidence linking [the boyfriend] to the actual perpetration of the crime, was inadmissible under Evidence Code section 1101," and the "drawings . . . could not link [the boyfriend] to [the victim] 'in the hours before her death, or indeed on the date of her death.' " (*Adams, supra*, at p. 253.)

2.      *Factual and procedural background*

Prior to trial, the court held a hearing for the purpose of determining whether it would permit Farley to introduce evidence suggesting that Pleasant's half brother, David Foster, might have committed the murder.[13]  At the hearing, defense counsel stated that Farley sought to present evidence that Foster had been living in Pleasant's apartment until March 2010, when the two got into a physical altercation and Pleasant demanded that Foster move out.  Defense counsel stated that Farley also wished to present evidence that police had found Foster's blood in the living room of Pleasant's apartment after the murder.

The prosecutor argued against the admission of the proffered third-party culpability evidence.  The prosecutor argued that that the amount of Foster's blood recovered in the apartment amounted to no more than a "speck" in the "doorway" of the apartment, which was insignificant in light of the fact that Foster had resided in the apartment for a period of time and often visited the apartment in order to clean himself up

---

[13]     Although the trial court stated at the hearing that the People had filed a "motion to exclude evidence of third-party culpability," that motion is not in the appellate record.

after skateboarding accidents.[14]  The prosecutor also noted that Foster had told police that he and Pleasant had reconciled, and that the two had spent Earth Day, April 20, 2010, together.  The prosecutor presented a photograph corroborating Foster's statement to police that he and Pleasant had spent Earth Day together.

The trial court ruled that Farley would not be permitted to present the proposed third-party culpability evidence at trial because the evidence did not tend to "raise a reasonable doubt" as to Farley's guilt.  The court noted that the evidence of "one droplet" of Foster's blood was not significant given that Foster had previously resided in Pleasant's apartment and Foster's many injuries.  The court also stated that there was no evidence that tended to connect Foster to the scene of the crime near the time of the murder.  In addition, the court stated, "[T]here have been certainly a lot of cases that are a lot stronger of connection than you have here [in which third-party culpability evidence] was held to be properly excluded."

3.      *Application*

The trial court could have reasonably concluded that evidence of a small amount of Foster's blood in Pleasant's apartment did not demonstrate more than a " 'remote' connection to the . . . crime scene" (*DePriest*, *supra*, 42 Cal.4th at p. 43), given that it was undisputed that Foster had resided in the apartment for a period of time just a few months prior to the murder.  (See *Adams*, *supra*, 115 Cal.App.4th at p. 253 [excluding

---

14      During the hearing, Foster appeared in court and showed the court many "healing" injuries on his torso.

third-party culpability evidence that "could not link [the third party] to [the victim] in the hours before her death, or indeed on the date of her death"].)  In addition, the trial court could have reasonably concluded that evidence that Foster and Pleasant had engaged in a single altercation a few months prior to the murder did not establish anything other than a "mere motive" to commit the murder, which was insufficient to raise a reasonable doubt as to Farley's guilt.  (*Hall*, *supra*, 41 Cal.3d at p. 833.)  Indeed, the motive evidence pertaining to Foster was considerably weaker than that discussed in *People v. Gutierrez* and *Adams*, in which reviewing courts affirmed the exclusion of third-party culpability evidence.  (See *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1134-1138; *Adams, supra*, 115 Cal.App.4th at p. 253.)

Accordingly, we conclude that the trial court did not abuse its discretion in excluding Farley's proffered third-party culpability evidence.[15]

F.      *There is no cumulative error*

Farley contends that the cumulative effect of the errors that he alleges requires reversal.  "Under the 'cumulative error' doctrine, errors that are individually harmless may

---

[15]      Farley claims that the trial court's alleged error in excluding the proffered evidence violated his constitutional right to present a defense.  In light of our conclusion that the trial court did not abuse its discretion in determining that the proffered evidence was irrelevant, it necessarily follows that the court did not violate Farley's constitutional rights by excluding the evidence.  (See *People v. Babbitt* (1988) 45 Cal.3d 660, 685 ["because defendant's evidence failed to meet the threshold requirement of relevance, its exclusion pursuant to [Evidence Code] section 352 did not implicate any due process concerns"]; accord *Adams*, *supra*, 115 Cal.App.4th at p. 254 [rejecting claim that exclusion of "irrelevant" third-party culpability evidence violated defendant's constitutional right to present a defense].)

nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) We have concluded that none of Farley's asserted claims of error has merit. As a result, there are no errors for which the cumulative effect would require reversal of the judgment against him.

G.      *The parole revocation fine in the abstract of judgment must be stricken*

The abstract of judgment indicates that the trial court imposed a $10,000 parole revocation fine pursuant to section 1202.45. The People acknowledge that the fine must be stricken because the trial court imposed a sentence of life without the possibility of parole. (Citing *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 ["A parole revocation fine may not be imposed for a term of life in prison without possibility of parole"].) We agree with the People's concession. Accordingly, we order the parole revocation fine stricken, and direct the trial court to prepare a new abstract of judgment.


IV.

DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court. On remand, the trial court is directed to prepare a new abstract of judgment in accordance with part III.G., *ante*, and to forward the new abstract of judgment to the Department of Corrections and Rehabilitation.

39

                                        _____
                                                        AARON, J.

WE CONCUR:


_____
            HALLER, Acting P. J.


_____
            McDONALD, J.