Filed 5/16/16  P. v. Tate CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040063 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 212169) |
| v. | |
| JASON PAUL TATE, | |
| Defendant and Appellant. | |

A jury found defendant Jason Paul Tate guilty of committing two lewd acts on a child under 14.  (Pen. Code, § 288, subd. (a).)  Defendant was sentenced to a 10-year prison term, with execution of that sentence suspended and formal probation imposed.  On appeal, defendant challenges the trial court's ruling excluding evidence that the victim's younger niece had made sexual assault allegations against him, and the prosecutor's decision to withdraw those charges from the grand jury's consideration based on the niece's poor and contradicted grand jury testimony.  Defendant also claims ineffective assistance of counsel at sentencing.  Finding no error, we will affirm.

## I.  BACKGROUND

Olivia Doe[1] was molested twice by defendant.  The first molestation occurred when she was six or seven years old.  She was in second grade and living in Salinas with her older sister who was her legal guardian, Grace Doe.  She also lived with Grace's

---

[1] We use pseudonyms to protect the victims' identities from disclosure.

daughter Yvonne Doe, four years her junior, and defendant, who was Grace's boyfriend. The second molestation occurred in 2011 when Olivia was 12 and in seventh grade. By that time the family had grown to include Grace's and defendant's two sons, born in 2007 and 2009.

Olivia disclosed the molestations to Grace on June 23, 2011, after Yvonne told Olivia that defendant had molested her. Yvonne also told her mother that she had been sexually molested by defendant. Both girls were interviewed that night by a responding detective, and both were interviewed by a female detective one week later. The interviews were recorded and transcribed. Both girls underwent sexual assault examinations on July 18, 2011.

## II.  TRIAL COURT PROCEEDINGS

### A.  GRAND JURY PROCEEDINGS

In March 2012 the cases were presented to a grand jury. Olivia, then 13, testified to two instances of lewd conduct by defendant consistent with her statements to the police, and the grand jury returned a two-count indictment based on her testimony.

Nine-year-old Yvonne testified that she was touched by defendant in an uncomfortable way in second grade. When asked to tell the grand jury what happened, she said "I've tried my best to forget. [I]t's going to be hard for me to remember." She said defendant's hands and lips touched her body but she could not remember what part of her body. She said "[a]ll I know is it happened when I was in the second grade." She remembered both police interviews and said she told the truth both times, but she could not remember what she said.

Yvonne testified that defendant touched her in a bad way the day the police came to her house, but she could not recall anything specific. Defendant had touched her breasts and butt inside her clothes but not on the day the police came. Defendant had touched her breasts, butt and front private in the bathroom more than once. That touching had happened 20 to 25 times, but she either could not recall or could not

2

describe any incident with specificity.  She repeatedly said she could no longer recall events.  Defendant "might have" rubbed his front privates all over her body, but she could not remember.  Yvonne denied or could not recall making statements to the police about kissing or contact with defendant's genitals, and she denied or could not recall whether that contact had occurred.  She declined to read a statement she had written at her second interview, stating it was sloppy and she could not see well.  She testified that defendant was always mean and strict, and he was the main reason she always got in trouble.

Grace testified that Yvonne told her on June 23, 2011 that defendant had molested her that day on the couch.  He made her get naked on top of him and kiss him on the mouth, and he rubbed her bottom and her private part.  The responding detective testified that Yvonne told him defendant had reached into her pants and touched her butt and vagina that day while she was on the computer.  Defendant brought her into his bedroom, where he made her take off her clothes, kissed her, and rubbed his penis all over her.  Yvonne told the responding detective something like that had occurred 50 or 60 times.  She said defendant had made her suck his penis and white stuff would come out, and that had happened between five and seven times, most recently about a month before the interview.

Yvonne told the female detective that she was first molested by defendant when she was in first grade.  She would not verbalize what happened, but she wrote that defendant made her kiss him and suck his wee-wee in the bathroom.  She described dropping to her knees when defendant grabbed her head, and said defendant told her he would beat her with a belt if she did not comply.  She said this happened again and again for about four months, then she corrected herself and said four weeks.  She said defendant never touched her butt, but he stuck his hand into her vagina, then she said it was a finger.  She said defendant placed his penis hard against her vagina several times.  The detective told her it was important to be clear, and she said "I just can't remember

3

that much." The detective told her if she did not remember, to say she did not remember, not to make things up. She responded "I can't remember too much." She said defendant had never threatened her, and when pressed she said "none [no threats] that I recall."

Yvonne told the SART examiner "He touches me in weird places," and "He kissed me and touched me with his hands."[2]

At the close of evidence, the prosecutor decided not to seek a true bill for the conduct involving Yvonne. She explained her decision to the grand jury: "I have decided not to seek an indictment for the conduct involving [Yvonne]. And that is based on the nature and quality of [Yvonne's] testimony at this hearing and her prior statements, which you heard in the form of testimony. [¶] The standard at a grand jury is probable cause. But, in fact, we seek to present cases for which there is evidence and proof beyond a reasonable doubt. That is our standard for conviction at trial. [¶] So, based on the state of the evidence, I'm not seeking an indictment -- any indictment for the conduct testified to by [Yvonne] Doe."

## B. TRIAL

### 1. The Prosecution's Case

#### a. Olivia's testimony

Olivia testified that defendant entered her bedroom at night when she was in second grade living in Salinas. She woke up but pretended to be asleep. Defendant touched her shoulder and she rolled from her back to her stomach. Defendant pulled down her pajamas and underwear, and he touched, kissed, and licked her bottom. She did not speak because she was scared. On direct examination Olivia did not remember telling the female detective that defendant put his finger in her bottom, but on redirect, presented with her prior statements, she testified that his finger did go inside her bottom. When she was in the seventh grade, around the time of the earthquake in Japan (March

_____

[2] The exam revealed no evidence of penetrating contact.

4

11, 2011) she told her best friend Pauline that defendant had touched her when she lived in Salinas and that he was her biggest fear because she was afraid he would do it again. She described the touching to Pauline as rape, which at that time she thought was the same as molestation.

Defendant touched Olivia again in bed when she was in the seventh grade. She had just awakened when defendant lay down beside her, touched her chest and stomach over her T-shirt, and said "[Olivia], I know you are awake." He said "I'm sorry," kissed her mouth, lifted and spread her legs, and kissed her vagina over her underwear. She was scared, cried, and told him to stop.

On June 23, 2011, Olivia told Grace that defendant had touched her. Her disclosure was prompted by a note she had received from Yvonne that afternoon that scared and upset her. Olivia was still upset when Grace came home, and Olivia was forthcoming and cried when Grace asked her what was wrong.

### b. Grace's testimony

Grace's relationship with defendant began in 2003 and ended on June 23, 2011, when Olivia made her disclosure. The two regularly argued, and at times restraining orders prevented defendant from contacting Grace. They argued on March 22, 2011 in defendant's car on Blossom Hill Road. Defendant eventually pulled over, Grace got out of the car, and defendant drove away. Grace reported to the police that day that defendant had hit her.

The evening of June 23, Grace noticed Olivia was not herself, so she asked Olivia what was wrong. Olivia started crying. After Grace asked again, Olivia responded, crying hysterically and telling Grace that defendant had touched her sexually. Grace also cried. She kept asking Olivia "Is it true[?]" and "Are you sure[?]" But there was nothing about Olivia that made Grace question her. She loved defendant, had two children with him, and did not want to believe he would do that. She was scared and called a friend who came over and called the police.

5

The family had lived in Salinas for one year—from August 2005 to August 2006, and Olivia was in the second grade during that time.

### c.     Other prosecution witnesses

The SART examiner testified that Olivia spoke of two molestations. The first occurred in Salinas. Olivia said "He thought I was sleeping. He would stick his fingers and lick it." Regarding the second time, Olivia said "He lay in my bed and he was touching my arms and chest, and then he put his lips on mine. He got up and spread my legs apart and kissed me in my private part."

The responding detective testified that Olivia told him that the first time involved defendant pulling down her underwear in bed, and kissing and touching her bottom. The second time defendant kissed Olivia on the lips and on her private parts.

The female detective testified that Olivia told her that defendant touched, kissed, and licked her bottom, and put his finger in her bottom when she was in the second grade, and more recently defendant had put his lips on Olivia's lips, moved his hand on her chest and stomach, lifted and spread her legs, and kissed her vagina over her underwear.

Olivia's classmate Pauline testified that in January or February 2011, when she and Olivia were in class in seventh grade, Olivia told her that defendant had raped her in the middle of the night when she lived in Salinas. Pauline did not ask Olivia what she meant by the word rape. Olivia told Pauline not to tell anyone.

### 2.     Defendant's Case

### a.     Defendant's testimony

Defendant and Grace had a love-hate relationship from 2004 to 2011. The couple argued frequently in front of Olivia, and they broke up several times. Defendant would move out, then return to the family home upon reconciliation. Grace reported many domestic incidents to the police to get defendant in trouble, some of which were untrue. When police responded to a domestic dispute in 2008, Olivia told them she had not seen anything. That was untrue, and when confronted by defendant after he and Grace had

6

reunited, Olivia explained that she stays with Grace when they fight and break up. Defendant did not press Olivia about her lack of candor with the police because he understood her position.

On March 22, 2011, defendant and Grace argued when he was driving on Blossom Hill Road. Defendant suggested to Grace that he stay at his brother's for a while. That angered Grace, who called the police from the car reporting that defendant was kidnapping her. Defendant was under a restraining order at that time, so he immediately called his parole officer. He pulled off the road, and he started walking to his grandmother's house because Grace would not get out of the car. His grandparents retrieved the car later. He denied hitting Grace that day. He acknowledged that the March 22 police report did not mention kidnapping.

Defendant never touched Olivia in a sexual way. Olivia was not a problem child, but she was sensitive and would cry easily. Defendant had a positive relationship with her. Defendant was home with the children on June 23, 2011, but left at some point to play poker. His aunt notified him that Grace had made a report against him, and he never returned home. Defendant admitted to prior felony convictions for stealing a laptop, selling drugs, and violating a court order related to Grace. He admitted a misdemeanor conviction for making terrorist threats.

### b. Defendant's grandmother's testimony

Defendant's grandmother confirmed that she and her husband picked up her car on Blossom Hill Road on March 22, 2011.

### C. SENTENCING

The jury found defendant guilty of two counts of committing lewd acts on Olivia. Defendant was sentenced on count 1 (based on the earlier offense) to the upper term of eight years, and to a two-year consecutive term on count 2 (the later offense). Notwithstanding the probation department's recommendation that defendant serve the prison term, the court suspended execution of sentence on the condition that defendant

complete five years' formal probation, including at least one year of sex offender treatment. The court ordered victim restitution, fines, fees, and probation conditions which included a one-year county jail sentence, drug and alcohol prohibitions, and specific restrictions on defendant's contact with minors.

## II. DISCUSSION

### A. EVIDENTIARY ERROR

Defendant argues that the trial court abused its discretion and denied him due process "by permitting the jury to be told that [Yvonne] had made allegations of sexual abuse against appellant but ruling that it was irrelevant that charges based on [Yvonne's] allegations had been dropped after her extremely poor testimony before the grand jury." According to defendant, the effect of the court's evidentiary ruling was to create "an inaccurate and unfairly prejudicial impression that [Yvonne] had made credible allegations" of sexual abuse against him.

The trial court is vested with wide discretion to determine relevance and weigh the prejudicial effect of proffered evidence against its probative value. (*People v. Edwards* (1991) 54 Cal.3d 787, 817.) On appeal, its ruling will not be disturbed absent an abuse of discretion. (*Ibid.*) Abuse of discretion occurs when " 'the court exceeds the bounds of reason, all of the circumstances being considered.' " (*People v. Adams* (2004) 115 Cal.App.4th 243, 252–253.) A due process violation results when evidentiary error makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

### 1. The Evidentiary Ruling

The People's trial brief asked the court to exclude under Evidence Code section 352 (1) evidence that defendant was charged with crimes against Yvonne, (2) evidence that the prosecutor did not seek an indictment for conduct involving Yvonne, and (3) evidence of Yvonne's statements, including her testimony before the grand jury and at trial. According to the brief, "the defense by necessity has to convince the jury that defendant never molested [Yvonne] in any form or fashion. Thus, there will

be for all intents and purposes a trial on those crimes. That litigation will likely become the predominant issue at trial. Thus, the admission of this evidence will also create substantial danger of confusing the issues. Presumably, the defense seeks to persuade the jury [Yvonne] is lying to convince them that [Olivia] is likewise untruthful when there is no nexus. Thus, the admission of this evidence will also create a danger of undue prejudice."

At the pretrial hearing addressing the prosecution's request, the court noted defendant's position that Olivia fabricated her story because either Grace put her up to it or it was part of a design by both girls to get defendant in trouble. Defendant argued that Yvonne's testimony before the grand jury and the prosecutor's reaction to that testimony demonstrated fabrication by Yvonne, and the fact that Olivia disclosed her molestations only after Yvonne told her what had happened to her showed that Olivia invented her story to copy her niece. Defendant pressed that "the totality of the evidence with respect to that sequence of events and the consequences of it" was relevant to judge Olivia's credibility—to determine whether Olivia copied Yvonne in a "me-too syndrome."

The court ruled that Yvonne's communication with Olivia was relevant to explain Olivia's delayed disclosure: "Clearly it's relevant if the People are going to be trying to explain delayed disclosure by [Olivia] Doe that the disclosure arose out of a communication she had with [Yvonne] asserting misconduct on the part of the defendant." The court further ruled that the details of Yvonne's disclosure, her later allegations, and her grand jury testimony were not relevant to Olivia's truthfulness. The court explained: "However, this is not a final ruling. A lot of things come into play here, the similarity of the disclosures, the timing, the presence of other persons. All of those things are relevant to the questions I've asked, but absent some proof that the disclosures made by [Yvonne] are false, this is not going to be a trial of the truth or falsity of [Yvonne's] allegations against the defendant."

9

The court then clarified what it was deeming admissible: "Counsel, the fact that [Yvonne] reported sexual molestation to [Olivia] may be inaccurate. I'm simply trying to paraphrase what I have heard counsel say. My only understanding is that [Yvonne] passed a note that she said something to [Olivia] and said, I can't say it, I want to write it, something to that effect. Yes, that's admissible."

2. **Analysis**

a. **Olivia's delayed disclosure**

The court's evidentiary ruling regarding Olivia's delayed disclosure was not an abuse of discretion. The ruling was narrow: It allowed Olivia to testify that her disclosure was prompted by the note Yvonne gave her. Indeed, the court's exclusion of the details of Yvonne's disclosure and its clarification that Yvonne's passing a note was admissible dispels any notion that it was allowing Olivia to testify to the girls' conversation or the hearsay content of Yvonne's note.

Olivia testified that Yvonne gave her a note that made her scared and upset, and that note prompted Olivia to tell Grace what defendant had done to her. Defendant does not dispute the relevancy of that evidence. Olivia did not testify to any molestations alleged by Yvonne. She did not testify to her conversation with Yvonne, nor did she mention the content of the note. Defendant's characterization of the ruling as "permitting the jury to be told that [Yvonne] had made allegations of sexual abuse against [defendant]" is inaccurate. The ruling did not allow evidence of or lend veracity to Yvonne's allegations, as defendant contends, because it did not permit evidence of her disclosure.

b. **Yvonne's grand jury appearance and the prosecutor's decision not to prosecute**

Defendant argues that the trial court abused its discretion by excluding Yvonne's testimony before the grand jury and the prosecutor's consequent decision to forgo prosecution on the molestation charges involving her. He argues that the ruling was

10

based entirely on relevancy grounds, and it should not be upheld under Evidence Code section 352, which gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.) " 'The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (*Ibid*.) Fairly understood, the court's relevancy observations were simply components of its ruling under section 352 that it would not permit a collateral "trial of the truth or falsity of [Yvonne's] allegations against the defendant." The court clearly had a concern with defendant seeking to introduce inconclusive evidence to establish that Yvonne had fabricated her disclosure to Olivia. Absent some *proof* of fabrication, the court was not going to allow the trial to devolve into a mini trial about Yvonne's veracity.

The ruling was not an abuse of discretion. The prosecutor's trial brief identified Yvonne's statements—to Olivia, to her mother, to two police officers, and to the SART examiner—and the judge met with counsel in chambers to discuss the matter before the hearing. Yvonne would have to testify before her grand jury testimony could be admitted (Evid. Code, §§ 1200, 1235, 1236), and the statements she made to Olivia, Grace, the SART examiner, and the police would be admissible to show that she had never retracted her disclosure. Presenting Yvonne's multiple statements to the jury would have shifted the focus of the trial to Yvonne, not only resulting in an undue consumption of time, but also creating the danger of confusing the issues.

Nor did the court abuse its discretion by excluding the prosecutor's decision to abandon the charges based on Yvonne's statements. That decision reflected the

11

prosecutor's estimation that it would be difficult to prove beyond a reasonable doubt discrete lewd acts during specific time periods. It did not directly speak to the truth of Yvonne's disclosure to Olivia, much less to Olivia's credibility.

### c. Due process

Defendant did not raise a due process claim in the trial court. On appeal, he claims his trial was rendered fundamentally unfair because the evidentiary ruling "create[d] an impression both that [Yvonne's] allegations should be viewed as credible and that the jury could weigh those allegations in deciding whether to find [defendant] guilty of the charges related to [Olivia]." Defendant argues that the ruling violated his due process right to a fair trial because "[t]he jury had been given no reason, after all, to believe that [Yvonne] was lying, and would consequently have assumed that a young girl must be telling the truth if she alleged 'he touches us.' " Defendant is referring to Grace's direct examination where she was asked whether Olivia had told her that defendant had touched her. Grace responded, "She said he touches us." The prosecutor clarified, "That he touched her?" and Grace responded "Yes."

As much as defendant tries to tether his due process argument to the court's pretrial evidentiary ruling, the record does not bear out a nexus. As we have detailed, the evidentiary ruling allowed Olivia to testify that Yvonne gave her a note to explain the timing of Olivia's disclosure; it did not permit Olivia to testify to the hearsay content of Yvonne's communication with her. The ruling therefore created no specific impression about Yvonne's allegations.

Nor did the ruling, directed at Olivia's testimony, permit Grace's "[s]he said he touches us" testimony—the only reference to any allegation by Yvonne in the entire trial[3]

---

[3] Defendant's briefing identifies a second reference to Yvonne's allegations which we attribute to a misstatement by the prosecutor. In her direct examination of Grace about Olivia's disclosure, the prosecutor asked: "Did you tell [defendant's] grandfather that [Yvonne] (verbatim) had disclosed some conduct to you?" Grace answered "I did"

*(Continued)*

12

and the testimony defendant complains actually prejudiced him. On direct examination, the prosecutor asked Grace if Olivia told her that defendant touched her. Grace responded, "She said he touches us." The prosecutor focused the inquiry on Olivia: "That he touched her?" Grace answered "yes." Defendant failed to object to that testimony. Accordingly, his claim is forfeited on appeal. (*People v. Poggi* (1988) 45 Cal.3d 306, 331 [" 'questions relating to admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' "].)

## B. SENTENCING ERROR—INEFFECTIVE ASSISTANCE OF COUNSEL

The probation report, read and considered by the trial court, recommended that probation be denied and defendant serve 10 years in prison. In support of the recommended upper term of eight years for count 1, the report identified eight aggravating factors: The crime involved a high degree of cruelty, the victim was particularly vulnerable, defendant took advantage of a position of trust, defendant had engaged in violent conduct indicating a serious danger to society, defendant's prior convictions were of increasing seriousness, defendant had served a prior prison term, defendant was on parole when the crime was committed, and defendant's prior performance on probation and parole was unsatisfactory. The report identified no mitigating circumstances. The probation report recommended a two-year consecutive sentence on count 2, representing one-third the middle term of six years.

---

to that question and to the prosecutor's follow up question, "That she … told you that [defendant] had done something sexually to her?" The prosecutor continued to ask questions about Olivia and the course of events that evening, with no mention of Yvonne. It appears from the line of questioning—indeed the court reporter's injection of the parenthetical "verbatim"—that the single reference to Yvonne was a mistake by the prosecutor. Defendant did not object to that reference, nor does he argue that it rendered his trial fundamentally unfair.

A psychological assessment conducted under Penal Code section 288.1 concluded that defendant had an interest in and willingness to comply with sex offender treatment. The reporting psychologist noted that defendant met the criteria for a pedophilic disorder diagnosis, but that the risk of reoffending was low.

The prosecutor agreed with the probation department's recommendation, describing the aggravating factors as "overwhelming." She pressed that the first offense occurred when Olivia was very young and defendant was on formal probation for a controlled substance conviction. She urged consecutive sentences because the offenses were attenuated by time and distance. She argued that defendant was not amenable to treatment because he continued to deny his crimes.

Defendant countered that he was agreeable to counseling, that his criminal history was not egregious, and that even though he made "miserable choices," a 10-year prison sentence was unwarranted. Counsel pleaded that the court "apply a level of mercy, a level of consideration for the totality of the facts," and impose a lesser sentence than that recommended by the probation department.

Before pronouncing sentence, the court rejected counsel's characterization of defendant as "some hapless victim of circumstance in this strange domestic dynamic," observing that defendant's criminal record, including convictions and arrests for inflicting injury on a child, child endangerment, violating domestic restraining orders, and making criminal threats in a domestic situation showed a pattern of volitional conduct. The court also rejected the prosecutor's argument that defendant was not amenable to treatment by virtue of his refusal to admit guilt to the psychologist or the probation officer, in light of defendant's concern that any admission could undermine his appeal.

The court imposed the upper term of eight years on count 1, commenting "I'm imposing that term on the basis of there being no finding of any mitigating circumstances," and a two-year consecutive sentence on count 2, for an aggregate 10-year

prison term. The court suspended execution of the sentence conditioned on successful completion of five years' formal probation.

Defendant contends that the trial court erred by imposing the upper term on count 1 based entirely on the absence of mitigating factors, and by failing to provide a basis for sentencing the two counts consecutively. Recognizing that he has forfeited those claims by failing to object in the trial court (*People v. Scott* (1994) 9 Cal.4th 331, 354), he asserts on appeal that counsel was constitutionally ineffective for not objecting to the court sentencing him without stating reasons for its sentencing choice.

Ineffective assistance of counsel requires a showing that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the case is affirmed [citation]." (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.) Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

Counsel's performance was not deficient because the record shows that the court considered the aggravating factors when it imposed the upper term on count 1. Indeed, the court read and considered the probation report, invited comment on the report's accuracy and content, and listened to the prosecutor's argument. The court's stated reason for imposing the upper term—the absence of mitigating factors—can only be understood in this larger context. Defendant does not argue that the probation report identified inapplicable aggravating factors, each of which could support an upper term

15

sentence. In light of this record, it was objectively reasonable for counsel not to seek a more detailed sentencing pronouncement.

Similarly, the imposition of a consecutive term for count 2 must be viewed in light of the probation report and the prosecutor's argument. As noted by the prosecutor, consecutive sentences were justified by the fact that the offenses occurred separately, years apart. (Cal. Rules of Court, rule 4.425(a)(3).) Given that the consecutive sentence was supportable, counsel's failure to seek reasons for the consecutive term did not constitute deficient performance.

In addition to deficient performance, defendant has failed to show prejudice resulting from counsel's not objecting. In light of the record's ample support for the 10-year prison sentence, and the court's showing of leniency by suspending execution of that sentence, it is not reasonably probable that defendant would have received a more favorable outcome had counsel objected to the stated reasons (or absence thereof) supporting his sentence.

## III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**I CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

**I CONCUR IN THE JUDGMENT ONLY:**

_____

Mihara, J.